ORIGINAL

FILED
JUN - 1 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Joyce Evans, Mike Arabian dba Arabian Farms, Jack and Mary Blehm, Earl Boyajian, Lynden Brack, Richard and Sally Chavez dba Chavez Farms, Neil Donovan, William Donovan, David Flagler, Walter George Flagler dba Flagler Farms, Chris Gauss, Brad Hansen, David & Belanie Horne dba M&D Farming, Mike Jerkovich, Kuldip and Charanjit Kaleka dba Kaleka Farms, Loren T. Linscheid dba Linscheid Farms, Michael A. Logoluso, Rick L. Logoluso, Tony M. Logoluso, Wayne McFarlane, Mike Moles, Hunter Nadler, Tom and Teresa Ochoa dba Ochoa Farms, Gregory and Donna Patterson, Morris Pivovaroff, Peter Ramirez, Robert Schneider, Dale Sedoo, Walt Shubin, Wayne Snell, Srabian Farms GP, and Wilkens Farm

Plaintiff(s),

v.

United States of America,

Defendant.

Case No. 06-439 L

## CLASS ACTION COMPLAINT

### Case Summary

1. Each year the United States, through its cabinet level agency the U.S. Department of Agriculture (USDA), regulatorily confiscates all right, title, and

ownership to thousands of bins[1] of raisins from the Named Plaintiffs and Putative Class Members. The regulatory euphemism is "Reserve Tonnage" or "Reserve Pool".[2] But it is government forced sharecropping with no compensation paid.

The U.S. Constitution, Fifth Amendment, says this:

'... nor shall private property be taken for public use, without just compensation.'

2. The annual raisin crop taking occurs each year. The Named Plaintiffs and other raisin grower Putative Class Members, each year carefully tend their vineyards for months, pick the grapes, dry them into raisins, put the raisins into bins, and deliver them to a raisin packer. The raisin packer pays for some raisins, but is prevented from paying for the Reserve Pool raisins. The government Reserve Pool program forces title transfer from the Named Plaintiffs and Putative Class Members to the RAC at the packer delivery point. Neither the government nor the RAC pay for the raisins.

3. These statutes and regulations provide this authority: the Agricultural Marketing Agreement Act of 1937 ("the Act") (7 *USC* §§ 601, et seq); the Marketing Order for Raisins Produced from Grapes Grown in California (the "Raisin Order") (7 CFR §§ 989.1 – 989.95); and the Rules and Regulations issued pursuant to the Act (the "Raisin Regulations") (7 CFR §§ 989.166 - 989.801). The Plaintiff and the class challenge these specific statutory and regulatory provisions: 7 *USC* § 608c, 7 *CFR* §§ 989.54(b),(d), 989.56, 989.66, 989.166 and 989.167.

4. The Named Plaintiffs respectfully seek a declaration the Reserve Pool mechanism is unconstitutional, as applied, under the Takings Clause (*U S Constitution, Amend V*); an injunction prohibiting further takings; and damages for takings in each of the past six (6) Crop Year's .[3]

5. Class action status is sought.

---

[1] A "bin" of raisins is a wooden box used to collect and transport the raisins from the vineyard after being dried from grape form. Drying occurs in the field. Raisins in raw form are delivered to raisin packers in these bins weighing 900 to 1200 pounds net.

[2] "Reserve Tonnage," "Reserve Pool," and "Reserve Raisins" all refer to the same regulatory program for purposes of industry usage, and for purposes of this Complaint.

[3] A "Crop Year" is from August 1 to July 31 of the next year. 7 CFR § 989.21. August is the earliest date raisin harvest begins each year.

**Jurisdiction and Venue**

6. This Court has subject matter jurisdiction under 28 *USC* § 1491 because the Named Plaintiffs claim a constitutional violation has occurred and the U.S. Government is defendant.

7. Venue is proper in this Court pursuant to 28 *USC* § 1491.

8. The Attorney General of the United States, and the Secretary of Agriculture have been advised of this suit's commencement because the lawfulness and constitutionality of parts of the Agricultural Marketing Adjustment Act and Raisin Marketing Order are challenged here.

**Parties**

9. The Named Plaintiffs are independent raisin growers. They and all Putative Class Members are "producers" under 7 *CFR* § 989.11. To the extent any raisin growers have packed their own raisins in some years, they may be deemed "handlers" under 7 CFR § 989.15; but they make no claims for any time periods or to the extent they act as "handlers." The Named Plaintiffs grow Thompson Seedless raisins, the most common variety in California. Some Named Plaintiffs grow other raisin varieties, and organically produced raisins.

10. These are the Named Plaintiffs:

10.1. Joyce Evans, a raisin grower in Caruthers, CA:

10.2. Mike Arabian dba Arabian Farms, a raisin grower in Kerman, CA;

10.3. Aulakh Farms, Inc., a raisin grower in Kerman, CA;

10.4. Jack and Mary Blehm, raisin growers in Kerman, CA;

10.5. Earl Boyajian, a raisin grower in Fresno CA;

10.6. Lynden Brack, a raisin grower in Kerman, CA;

10.7. Richard B. and Sally A. Chavez dba Chavez Farms, raisin growers in Fresno, CA;

10.8. Neil Donovan, a raisin grower in Fresno CA;

10.9. William H. Donovan, a raisin grower in Fresno CA;

10.10. David Flagler, a raisin grower in Selma CA;

10.11. Walter George Flagler dba Flagler Farms, a raisin grower in Parlier, CA;

10.12. Chris Gauss, a raisin grower in Madera, CA;

10.13. Brad Hansen, a raisin grower in Madera, CA;

10.14. David & Melanie Horne dba M & D Farming, raisin growers in Fresno, CA;

10.15. Mike Jerkovich, a raisin grower in Kerman, CA;

10.16. Kuldip and Charanjit Kaleka dba Kaleka Farms, raisin growers in Kerman, CA;

10.17. Loren T. Linscheid dba Linscheid Farms, a raisin grower in Fresno, CA;

10.18. Michael A. Logolusa, Sr., a raisin grower in Madera, CA;

10.19. Rick L. Logolusa, a raisin grower in Madera, CA;

10.20. Tony M. Logolusa, a raisin grower in Madera, CA;

10.21. Wayne McFarlane, a raisin grower in Clovis, CA;

10.22. Mike Moles, a raisin grower in Fresno, CA;

10.23. Hunter Nadler, a raisin grower in Madera, CA;

10.24. Tom and Teresa Ochoa dba Ochoa Farms, raisin growers in Fresno, CA;

10.25. Gregory and Donna Patterson, raisin growers in Kerman, CA;

10.26. Morris Pivovaroff, a raisin grower in Kerman, CA;

10.27. Peter Ramirez, a raisin grower in Kerman, CA;

10.28. Robert Schneider, a raisin grower in Kerman, CA;

10.29. Dale Sedoo, a raisin grower in Selma, CA;

10.30. Walt Shubin, a raisin grower in Kerman, CA;

10.31. Wayne Snell, a raisin grower in Clovis, CA;

10.32. Srabian Farms G.P., a raisin grower in Fowler, CA;

10.33. Wilkens Farm, a raisin grower in Fresno, CA.

11. The U.S. Department of Agriculture (USDA) is a cabinet level agency of the Defendant United States of America pursuant to 7 *USC* § 2202. USDA carries out many regulatory and enforcement duties including overseeing marketing orders created under the authority of the Agricultural Marketing Agreement Act (AMAA) of 1937. USDA's primary California presence with regard to the Raisin Order is in Fresno, California.

**Important Non-Parties**

12. The Raisin Administrative Committee is a corporation created by the government. The AMAA of 1937 authorized the Secretary of Agriculture to delegate the responsibility of implementing marketing orders to marketing committees, such as the RAC, and to empower these committees to issues rules and regulations. 7 *USC* § 608c(7)(i) to (iv). The RAC is the quasi-governmental entity charged with administering the Raisin Marketing Order. 7 *CFR* § 989.35(a)(b). Its existence arose from, and depends upon, words written in the Federal Register.

13. The RAC has 47 members. These members are appointed by the Secretary of Agriculture after industry nomination. 7 *CFR* § 989.26. The RAC employs its own staff, and is funded by two sources: (a) regulatory assessments paid by raisin handlers/packers, and (2) proceeds from sales of Reserve Raisins formerly owned by the Named Plaintiffs and Putative Class Members.

14. The RAC is an agent of the US Government for all purposes relevant to this action. *Lion Raisins, Inc. v. United States*, 416 F3d 1356 (Fed Cir 2005).

**Class Action Allegations**

15. Named Plaintiffs bring this action on behalf of themselves and for similarly situated raisin producers. The class for whom Named Plaintiffs act is:

> All California raisin producers whose title to raisins has transferred to the Raisin Administrative Committee upon delivery to any packer through the Reserve Tonnage program from June 1, 2000 to present.

The class excludes however (a) all California raisin producers otherwise qualified for class membership who are current RAC board members, RAC employees, or employees of the USDA;.(b) California raisin producers who are (i) employees of any raisin packer or (ii) raisin packers; (c) producers engaged in joint ventures with any raisin packer to the extent their joint venture includes raisin production; (d) producers who are deemed handlers, but only for the years in which they are deemed handlers, and (e) any portion of class members' crops not grown in California and thus are not subject to the Raisin Order.

**Commonality**

16. Class action proceedings are appropriate in this lawsuit. This case presents issues of fact and law common to all members of Named Plaintiffs' class. Each of these issues affect all members of Named Plaintiffs' class in a common way. Common questions include, but are not limited to these issues:

16.1. Do raisins and cash proceeds from raisin sales constitute private property for *U S Const Amend* V purposes?

16.2. Were Named Plaintiffs, and were Putative Class Members, forced by Defendant's Reserve Pool program to transfer title to their raisins upon delivery to raisin packers/handlers subject to Defendant's Reserve Tonnage requirements and lose control of their Reserve Tonnage and proceeds of sale of raisins taken from them during the class period? (9 *CFR* § 989.66)

16.3. Were Named Plaintiffs, and Putative Class Members, deprived of private property in the form of raisins or raisin sale proceeds because such property was taken by Defendant under the purported authority of the AMAA, the Raisin Order and/or the Raisin Regulations?

16.4. Did Defendants take private property owned by Named Plaintiffs and Putative Class Members during the class period? If so, what just compensation is due for the property taken?

16.5. Did Named Plaintiffs and Putative Class Members receive, or were they denied, just compensation for their Reserve Raisins? If so, what is the nature and extent of their damages?

16.6. Do the Act, the Raisin Order, and/or the Raisin Regulations issued by Defendant, violate *U S Const, Amend* V as applied to Named Plaintiffs and Putative Class Members?

17. These and other questions common to Named Plaintiffs and Putative Class Members predominate over individual issues affecting individual class members.

**Numerosity; Superiority**

18. The Named Plaintiffs reasonably believe more than 2,500 raisin producers in California are putative members of the class. All these persons share common interests in the outcome of the Named Plaintiffs' claims. Yet each individual class member may have a claim so small financially that there is no reasonable likelihood individual class members can, or will, pursue vindication of their legal rights in separate proceedings. If they were to do so, this Court would be overrun with individual lawsuits. Accordingly, a class action is a superior method for adjudicating the claims and interests of the Named Plaintiffs and Putative Class Members.

**Typicality**

19. The Named Plaintiffs are typical raisin producers who are not raisin packers. The Named Plaintiffs' circumstances in their raisin production business make the issues in this case typical of those of all similarly situated raisin producers. Therefore, the Named Plaintiffs' issues are common to, and typical of, those in which Putative Class Members are interested. The Named Plaintiffs suffer from no entanglements, conflicts or disqualifications adversely affecting their ability to serve as class representatives.

20. Efficiency and economy of judicial resources, conservation of defense costs as well as costs to prosecute these claims, are best served by preserving and adjudicating these common questions in a single proceeding.

21. The Named Plaintiffs are fit and appropriate representatives for entire class. They are within the class definition. The Named Plaintiffs will adequately represent the class and are committed to this litigation. They have engaged in careful selection of counsel and are committed to see the case through to its conclusion. The

Named Plaintiffs have engaged competent counsel with experience in class action litigation and agricultural issues.

**Facts**

22. The Named Plaintiffs and Putative Class Members own or lease grape production fields (vineyards) to grow grapes, which are picked and dried to produce raisins. They grow raisins on 5 to 500+ acres, as the case may be, in California. Considerable Plaintiff capital is tied to this land, which is worth $9,000 to $20,000 per acre. Some grape vines are nearly 100 years old, due to careful maintenance and attention.

23. The Named Plaintiffs and Putative Class Members use their own and/or hired labor to grow the grapes, pick them, dry them in the field, load them in bins, and truck them to the processing plant for sale or custom packing. The Named Plaintiffs' raisin production costs are $700 - $800 per ton, including weed control, pest control, labor, cutting, replanting, harvesting, loading, binning, storing and trucking before the raisins arrive at the plant.

24. The price of raisins ranges from approximately $750 to $1,210 per ton over the last six years. This price is achieved only if all maturity and other standards are met, the producer has his/her own raisin bins, and pays trucking costs. These prices are negotiated by the non-party Raisin Bargaining Association[4] each year.

25. USDA, through the RAC, forcibly confiscates up to 47% of Plaintiffs' raisin crop each year. This confiscated volume is regulatorily dubbed "Reserve Tonnage."

26. The industry wide raisin yield range for raisins is between 1.5 and 2.5 tons per acre. The USDA and RAC set the Reserve Pool percentage for each Crop Year, finalizing the percentage taken on February 15 through published notice in the *Federal Register*.

---

[4] The Raisin Bargaining Association (RBA) is a cooperative which negotiates with raisin packers to establish a raisin price. The raisin price is used by the RAC and USDA in their calculations to establish the amount of Reserve Raisins through regulation.

27. For example, the reserve tonnage for the 2005/2006 Crop Year is 26%, finalized February 15, 2006. On a 100 acre farm averaging 2 tons raisin production per acre, fifty-two tons, or 104,000 pounds of raisins will be transferred to RAC ownership as a result. Approximately 100 separate raisin bins will be taken from this hypothetical producer. This season's price, negotiated for the production industry by the Raisin Bargaining Association, is $1,210 per ton. The value of this 100 acre farm's raisins taken by Defendant will be $62,920. The raisin packer will only pay for those raisins not taken, i.e. Free Tonnage.

28. The Named Plaintiffs and Putative Class Members pay all fixed and variable costs to produce these taken raisins, but receive little or no compensation for them upon being taken by the Government.

29. The AMAA of 1937 grants this power to USDA:

> Establishing or providing for the establishment of reserve pools of any such commodity or product, or of any grade, size, or quality thereof, and providing for the equitable distribution of the net return derived from the sale thereof among the persons beneficially interested therein.
>
> 7 *USC* § 608c(6)(E)

30. Several marketing orders arose from The AMAA of 1937 (the Act). The Raisin Order was first established in 1949. This full name of the Raisin Order is: "Raisins Produced from Grapes Grown in California." 7 *CFR* § 989.1 to 989.95. The Raisin Order further gave rise to the Raisin Regulations. 7 *CFR* § 989.102 to 989.801.

31. The Reserve Pool was not a part of the Raisin Order when any raisin producer vote occurred. The current form of the Reserve Pool was established after the last producer vote. However, producer majority approval would not render the program constitutional.

32. The RAC, established by the Order, has broad governmental powers, but is directly supervised and ultimately controlled by the U.S. Department of Agriculture.

The committee shall have the following powers:

(a) To administer the terms and provisions of this part;

(b) To make rules and regulations to effectuate the terms and provisions of this part;

(c) To recommend to the Secretary amendments to this part; and

(d) Receive, investigate, and report to the Secretary complaints of violations of this part.

7 *CFR* § 989.35.

33. The RAC recommends interim Free Tonnage[5] and Reserve Raisin percentages on or before October 5th each Crop Year, and final percentages on or before each February 15th. The final recommendation is submitted to the Secretary of Agriculture for regulatory action. 7 *CFR* § 989.54(b) to (d). The Secretary then acts upon the recommendation by publishing the final binding "Free Tonnage" and "Return Tonnage" raisin percentages in the Federal Register.

34. USDA approved the following Free Tonnage and Reserve Tonnage amounts for Thompson Natural Seedless raisins in recent years:

34.1. 1999 – 2000 Crop Year, 85% Free Tonnage and 15% Reserve Tonnage;

34.2. 2000 – 2001 Crop Year, 53% Free Tonnage and 47% Reserve Tonnage;

34.3. 2001 – 2002 Crop Year, 63% Free Tonnage and 37% Reserve Tonnage;

34.4. 2002 – 2003 Crop Year, 53% Free Tonnage and 47% Reserve Tonnage;

34.5. 2003 – 2004 Crop Year, 70% Free Tonnage and 30% Reserve Tonnage;

34.6. 2004 – 2005 Crop Year, 100% Free Tonnage and 0% Reserve Tonnage.

---

[5] "Free Tonnage" is the raisin crop portion not confiscated by Defendant under the Reserve Pool program. Growers sell the Free Tonnage to the processor upon delivery and receive money from the sale.

34.7. 2005 – 2006 Crop Year, 82% Free Tonnage and 18% Reserve Tonnage.

35. Ordinary raisins in a grower's field or storage area are not designated Free Tonnage or Reserve Tonnage raisins. Free Tonnage and Reserve Tonnage raisins look exactly the same. The regulatory bifurcation occurs upon delivery to a raisin packer. Upon this delivery, the Order and Regulations require the raisin packer to physically set the Reserve Tonnage raisin bins aside and store them for the RAC, the new legal owner of the raisins.

36. The grower receives a check for the Free Tonnage raisins, which are processed and sold into standard sales outlets. For the Reserve Tonnage raisins, the grower receives:

36.1. Zero money;

36.2. Platitudes about helping prevent market disruption;

36.3. An illusory – and often valueless – right to future equity payments from the money remaining in the Crop Year's Reserve Pool after the raisins are give to raisin packers, or sold to pay the RAC administrative expenses;

36.4. The bills for fixed and variable costs necessary to produce those raisins.

37. Raisin packers are required to hold those Reserve Tonnage raisin bins on their property until the RAC disposes of them. The RAC disposes of the raisins in so-called "alternative marketing channels," using the sales proceeds to subsidize raisin packer exports to foreign countries. The RAC also gives the physically taken raisins to packers in a "raisin back" program for the packers to sell in export markets.

38. Approximately $132 million in grower raisins has been transferred to raisin packers from the 2001 through 2006 Crop Years. The Named Plaintiffs and Putative Class Members have received little or no "grower equity" payments during this time.

39. The RAC also uses approximately $2.5 million from Reserve Tonnage sale proceeds to finance its budget each year.

40. The RAC enforcement mechanism, established by Regulation, is pervasive. Enforcement is required to force growers to allow these takings. Deterrence from non-compliance is a major goal of the RAC and USDA. An RAC "Compliance Committee" oversees these efforts, and an RAC "Compliance Officer" carries out the function. USDA investigators and government investigative tools are also used. RAC has unrestricted access to handler[6] plants and records for inspections. 7 *CFR* § 989.77.

41. The RAC requires many report submissions to RAC by handlers, including these:

41.1. RAC-1 Forms, "Weekly Report Of Standard Raisin Acquisitions," authorized by 7 *CFR* § 989.73(b),

41.2. RAC-20 Forms, "Monthly Reports Of Free Tonnage Raisin Disposition," authorized by 7 *CFR* § 989.73(d),

41.3. RAC-50 Forms, "Inventory Of Free Tonnage Standard Quality Raisins On Hand," authorized by 7 *CFR* § 989.73(a),

41.4. RAC-51 Forms, "Inventory Of Off-Grade Raisins On Hand," authorized by 7 *CFR* § 989.73(a).

42. Raisins packers have three business days after the RAC interim percentage announcement of Reserve Tonnage raisins to begin physically setting aside producer raisin bins designated as Reserve Raisins for the ownership of RAC. 7 *CFR* § 989.66(b)(1); 7 *CFR* § 989.166(b). Once a reserve "stack"- or group of bins each containing 900 to 1,200 pounds of raisins – is established and identified by the packer, the raisin packer may not use or sell it until the RAC releases it. 7 *CFR* § 989.166(b)(1). The RAC is the owner of the raisins placed and stored on raisin packer's property. Packers must deliver the reserve holdings to the RAC upon demand or pay damages to the RAC. 7 *CFR* § 989.166(c).

43. Prior to raisins being legally transferred to the Reserve Pool, the Named Plaintiffs held legal title to them, including the full bundle of property rights. Upon Reserve Program transfer, Plaintiffs no longer maintained a property interest in the raisins. *Lion Raisins, Inc. v. United States*, 416 Fed 3d 1356 (Fed Cir 2005).

---

[6] A "handler" is virtually the same as a raisin "packer" under the Raisin Order. 7 CFR §§ 989.14, 989.15.

44. After the USDA confiscates this property, through its agent the RAC, no compensation is paid. More than one-half the RAC budget is funded by the Reserve Program. A large portion of the Reserve Pool raisins – or Reserve Raisin sales proceeds - are given to raisin packers to subsidize packers' overseas sales at prices well below the U.S. price. RAC also sells substantial volumes of Reserve Raisins to USDA at far below market price to supply school lunch and other food programs.

45. Defendant USDA mollifies growers by claiming they retain grower "equity" subject to later payback. The grower "equity" actually returned to growers has been miniscule, and often zero. No payments are ever made during the year of the taking.

**Legal Claims – Fifth Amendment Violation**

46. The Named Plaintiffs and Putative Class Members possessed full legal title to the raisins they produce, at substantial expense and risk, prior to those raisins being transferred to the RAC under the Reserve Raisin Program.

47. The raisins are property within the meaning of the Takings Clause, *US Const, Fifth Amendment*. These raisins are taken by the government and the RAC when Reserve Pool transfer occurs at a handler's plant. The Named Plaintiffs and Putative Class Members lose their property rights in the raisins, and receive no just compensation – usually no compensation at all.

48. The Named Plaintiffs neither assert nor concede the Order and Regulation's are within the AMAA of 1937 (the Act) scope of authority. This is not a challenge claiming the Raisin Order violates the Act.

49. USDA has consistently asserted the Raisin Order and the Raisin Regulations as written and as applied within the Act's scope of authority. For purposes of this claim, Plaintiffs do not challenge this USDA assertion.

50. The Raisin Reserve Program violates the *U S Constitution, Amend V*, because Plaintiff's raisins are property taken by the U.S. Government and its agent, the RAC, without just compensation.

## Requests for Relief

51. Wherefore, the Named Plaintiffs respectfully request this Court:

51.1. Declare, adjudge, and decree that these rules violate the *U S Constitution, Amend V*, as applied to the Reserve Pool program:

7 *USC* § 608c(6)(e); 7 *CFR* § 989.54(a) and (b); 7 *CFR* § 989.56; 7 *CFR* § 989.66, 7 *CFR* § 989.166; 7 *CFR* § 989.167.

51.2. Enjoin the USDA and its agents from directly or indirectly committing the violations of *U S Constitution, Amend V*, in which they have been engaged;

51.3. Award equitable restitution for an amount equal to the value of property taken without payment;

51.4. Award damages for an amount equal to the value of property taken without payment;

51.5. Award attorneys fees, costs and interest.

May 31, 2006

Named Plaintiffs,

By: ______________________

Michael C. Stumo (Attorney of Record)
David A. Domina (Of Counsel)
DOMINALAW Group pc llo
2425 S. 144th Street
Omaha, NE 68144-3267
(402) 493-4100
f: (402) 493-9782
mstumo@dominalaw.com
efiling@dominalaw.com

Brian C. Leighton (Of Counsel)
Law Offices of Brian C. Leighton
701 Pollasky Avenue
Clovis, CA 93612
(559) 297-6190
f: (559) 297-6194
bleighton@arrival.net

*Attorneys for the Named Plaintiffs*