# United States Court of Federal Claims

JOYCE EVANS, et al.,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 1:06-cv-00439-CFL

Hon. Charles F. Lettow, Judge

**BRIEF OF AMICUS CURIAE PACIFIC LEGAL FOUNDATION IN OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. THE PLAINTIFFS' RAISINS ARE THE PRODUCT OF THEIR LABOR, INGENUITY, AND EXPENDITURE OF MONEY, AND THEY HAVE THE RIGHT TO OWN AND DISPOSE OF THOSE RAISINS . . . . . . . . . 2

II. WHEN GOVERNMENT TAKES A DISCRETE PROPERTY RIGHT, EVEN IN THE PROCESS OF A COMPREHENSIVE REGULATORY SCHEME, THE FIFTH AMENDMENT REQUIRES IT TO COMPENSATE THE OWNER . . . . . . 5

III. THE TAKING OF PLAINTIFFS' RAISINS IS NOT "VOLUNTARY" . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . 8

*Andrus v. Allard*, 444 U.S. 51 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360 (2004) . . . . . . . . . . . . . . . . . . . . . 7

*Babbitt v. Youpee*, 519 U.S. 234 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cal-Almond, Inc. v. United States*, 30 Fed. Cl. 244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Cecilia Packing Corp. v. USDA*, 10 F.3d 616 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . 4, 8-9

*Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . 4

*Fish Bros. Wagon Co. v. Fish Bros. Mfg. Co.*, 95 F. 457 (8th Cir. 1899) . . . . . . . . . . . . . . . . . 3, 9

*Hinkle Northwest, Inc. v. SEC*, 641 F.2d 1304 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

*Hodel v. Irving*, 481 U.S. 704 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

*Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 7-8

*Lion Raisins, Inc. v. United States*, 416 F.3d 1356 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 1

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Nollan v. Cal. Coastal Comm'n*, 223 Cal. Rptr. 28 (Cal. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . 5

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5-7, 9

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*Phillips v. Wash. Legal Found.*, 524 U.S. 156 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Page**

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5-8

*The Antelope*, 23 U.S. (10 Wheat.) 66 (1825) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . 4

*Washington v. Glucksberg*, 521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**United States Constitution**

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-5, 11

**Miscellaneous**

Bensing, Daniel, *The Promulgation and Implementation of Federal Marketing Orders Regulating Fruit and Vegetable Crops Under the Agricultural Marketing Agreement Act of 1937*, 5 San Joaquin Ag. L. Rev. 3 (1995) . . . . . . . . . . . . . . 1, 10

2 Blackstone, William, *Commentaries* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1 Coke, Edward, *Institutes* (1st Am. ed. 1812) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Eagle, Steven J., *Regulatory Takings* § 7-7(e)(5) (3d ed. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Eagle, Steven J., *The Regulatory Takings Notice Rule*, 24 U. Haw. L. Rev. 533 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

Locke, John, *The Second Treatise of Civil Government* (Peter Laslett ed., 1963) . . . . . . . . . . . . 3

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs are independent raisin growers who want to be compensated for the government's seizure of raisins that they produce through their labor, ingenuity, and investment. These raisins are taken by a government-empowered cartel, which exists for the purpose of increasing the price of raisins and subsidizing the below-market sale of raisins overseas. *See generally Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1358-60 (Fed. Cir. 2005); Daniel Bensing, *The Promulgation and Implementation of Federal Marketing Orders Regulating Fruit and Vegetable Crops Under the Agricultural Marketing Agreement Act of 1937*, 5 San Joaquin Ag. L. Rev. 3 (1995). Because this regulatory scheme has been in place for many years, the Defendant has moved to dismiss, on the grounds that a raisin producer cannot reasonably expect to sell all of the raisins that he or she produces, and therefore that no taking has occurred. *See* Motion to Dismiss at 6.

This contention must fail. The Plaintiffs have a compensable property right in the raisins that they have labored to produce, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984), and those raisins are physically seized by the government. The rule that the existence of a comprehensive regulatory scheme can defeat a property owner's expectations and defeat a takings claim applies only where the "property" at stake is a government-created benefit. *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 833 n.2 (1987). But the Plaintiffs' right to sell their raisins cannot even remotely be described as a government benefit. *Id.* It is an inherent right of ownership and a discrete strand in the bundle of rights making up private property. *Cf. Hodel v. Irving*, 481 U.S. 704, 716 (1987). Its extinguishment requires compensation. Nor can the allegedly "voluntary" nature of the taking defeat Plaintiffs' claims, since the voluntariness is in fact illusory. Plaintiffs are not willing participants in the seizure of their raisins, and are systematically denied any serious freedom of choice by the cartel established under the challenged statutory scheme. The motion to dismiss should be denied.

## ARGUMENT

## I

## THE PLAINTIFFS' RAISINS ARE THE PRODUCT OF THEIR LABOR, INGENUITY, AND EXPENDITURE OF MONEY, AND THEY HAVE THE RIGHT TO OWN AND DISPOSE OF THOSE RAISINS

In its motion to dismiss, the Defendant (hereafter the Government) contends that the raisin industry is heavily regulated, and therefore that the taking of property pursuant to a regulation of "the flow of agricultural products affecting interstate commerce *cannot* give rise to a takings claim." Defendants' Motion to Dismiss at 6 (emphasis added). The Government's theory is that because the production of raisins is a heavily regulated industry, the producers of raisins could have no reasonable expectation of selling the raisins they grow. *See id.* (citing *Cal-Almond, Inc. v. United States*, 30 Fed. Cl. 244, 247 (1994). This is in error, however. The raisin producers have a property right to sell their raisins, and when government extinguishes that right for public use, it must pay just compensation. The Plaintiffs have stated a cause of action for the taking of their raisins and the motion to dismiss should be denied.

The Fifth Amendment prohibits the government from taking "private property" without just compensation. But the Amendment does not define "property." The Supreme Court has therefore declared that "the existence of a [compensable] property interest is determined by reference to 'existing rules or understandings that stem from an independent source.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

A person's right to sell the raisins that he or she produces is an inherent right of ownership and arises from an independent source. Perhaps no property right is more fundamental to the history

of Western Civilization than the right of an agricultural producer to sell his or her product. *See, e.g.,* John Locke, *The Second Treatise of Civil Government* 333-34 (Peter Laslett ed., 1963) (describing origin of property rights from agricultural production). The very term "fruits of one's labors" reveals the long-standing nature of this right in Anglo-American "history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). *See also The Antelope*, 23 U.S. (10 Wheat.) 66, 120 (1825) ("That every man has a natural right to the fruits of his own labour, is generally admitted; and that no other person can rightfully deprive him of those fruits, and appropriate them against his will, seems to be the necessary result of this admission."); *Monsanto*, 467 U.S. at 1003 (finding that trade secrets are a compensable property right under the Fifth Amendment because they are "the products of an individual's 'labour and invention.'" (citing 2 William Blackstone, *Commentaries* *405) Locke, *supra*, at Ch. 5).

The right to use or dispose of property is an essential element of property rights. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82 n.6 (1980) ("The term 'property' as used in the Taking Clause includes the entire 'group of rights inhering in the citizen's [ownership] . . . . [including] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.") (citations omitted)); *Fish Bros. Wagon Co. v. Fish Bros. Mfg. Co.*, 95 F. 457, 461 (8th Cir. 1899) ("The principal value of property inheres in the right to sell it, and all property is presumed to be salable and assignable, unless its sale or assignments is clearly forbidden."). *See also* Blackstone, *supra*, at *447 ("Where the vendor *hath* in himself the property of the goods sold, he hath the liberty of disposing of them to whomever he pleases, at any time, and in any manner.").

In *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017 (1992), the Supreme Court captured this principle in a quotation from Sir Edward Coke: "'[F]or what is the land but the profits thereof[?]'" (quoting 1 Edward Coke, *Institutes*, ch. 1, § 1 (1st Am. ed. 1812)). As Prof. Steven

Eagle has explained, this phrase "stands for the proposition that 'ownership' is not possession in and of itself, or something that is framed on a wall or filed in a courthouse. Rather, it is the right to engage in conduct, to exclude others from interfering, and to transfer those rights to others." Steven J. Eagle, *The Regulatory Takings Notice Rule*, 24 U. Haw. L. Rev. 533, 535 (2002). Among the other "sticks" in the "bundle" of rights that make up property is the right to sell or otherwise dispose of that property. *See Hodel*, 481 U.S. at 716 ("In one form or another, the right to pass on property . . . has been part of the Anglo-American legal system since feudal times."); *accord, Babbitt v. Youpee*, 519 U.S. 234, 244-45 (1997); *Hinkle Northwest, Inc. v. SEC*, 641 F.2d 1304, 1307 (9th Cir. 1981) ("Ownership is a collection of rights to use and enjoy property including the right to sell and transmit the same." (quoting *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 736 (9th Cir. 1980) (citations omitted)); *see also Cienega Gardens v. United States*, 331 F.3d 1319, 1328-29 (Fed. Cir. 2003) ("An owner of land in fee simple generally has inherent rights" to use his property for profit.); *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) (finding compensable property right to operate its mine).

The very existence of property makes little sense in most cases without the right to sell or otherwise alienate property as one chooses. In *Hodel*, the Supreme Court acknowledged that for government to eliminate the right of Indian property owners to alienate fractional interests of tribal land was a violation of their Fifth Amendment rights. Although the government certainly has "broad authority to adjust the rules governing the descent and devise of property," 481 U.S. at 717, and heavy regulatory authority where Indian tribes are concerned, *id.* at 712, the Court held that "complete abolition of both the descent and devise of a particular class of property may be a taking." *Id.* at 717.

In this case, the government physically seizes the raisins that Plaintiffs produce, prohibiting them from alienating these raisins as they please. While the government may have strong power to regulate the raisin industry, just as it has broad authority over Indian tribal lands, it must still compensate property owners for taking their property for public use.

## II

## WHEN GOVERNMENT TAKES A DISCRETE PROPERTY RIGHT, EVEN IN THE PROCESS OF A COMPREHENSIVE REGULATORY SCHEME, THE FIFTH AMENDMENT REQUIRES IT TO COMPENSATE THE OWNER

In *Monsanto*, 467 U.S. at 1003, the Supreme Court found that Monsanto had a property right in its trade secrets because they were (like the raisins here) the product of the owner's labor, ingenuity, and expenditure. Yet while trade secrets are a compensable property right, the Court continued, the Monsanto company could not have formed a "reasonable investment-backed expectation" that the government would refrain from ordering the disclosure of trade secrets. 467 U.S. at 1005. Because Monsanto was on notice of the possibility that the federal government might reveal the secret forumlae of Monsanto's products, it could not contend that such disclosure was a taking.

The narrowness of the *Monsanto* ruling was clarified, however, by the Court's decision in *Nollan*, 483 U.S. 825. In that case the property owners alleged a taking when a state agency demanded that they give up a public easement in exchange for a building permit. The lower court found that the use of land in California was highly regulated, and thus the owners were on notice of the Coastal Commission's practice of demanding easements in exchange for permits. *See Nollan v. Cal. Coastal Comm'n*, 223 Cal. Rptr. 28 (Cal. Ct. App. 1986) ("The Nollans' property lies in an area where numerous dedications for public access have been made on nearly all the beach front

parcels."). But the Supreme Court reversed, rejecting the theory that the existence of pervasive regulation bars a takings claim. *See Nollan*, 483 U.S. at 833 n.2. Justice Brennan, in dissent, invoked *Monsanto* for the proposition that the Nollans were "on notice . . . that a condition of approval would be a provision [requiring a public easement]," *Nollan*, 483 U.S. at 858 (Brennan, J., dissenting), but the majority opinion rejected this because

> [i]n *Monsanto* . . . we found merely that the Takings Clause was not violated by giving effect to the Government's announcement that application for "*the right to [the] valuable Government benefit*," of obtaining registration of an insecticide would confer upon the Government a license to use and disclose the trade secrets contained in the application. But the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—cannot remotely be described as a "governmental benefit."

*Id.* at 833 n.2 (citations omitted).

Similarly, the property right at issue here—the right of the Plaintiffs to sell the raisins that they have produced—cannot be described as a "governmental benefit." The *Monsanto* "notice rule" is therefore inapplicable in this case.[1]

In *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), the Court again explained that mere notice of the possibility of a regulation cannot diminish a property owner's rights such a degree as to eliminate a takings claim. Government may not use regulations to "shape and define property rights and reasonable investment-backed expectations" so as to foreclose takings claims on the basis that the owner "purchased or took title with notice of the limitation." *Id.* at 626. Although government may enforce reasonable limits on the use of property, the Constitution guarantees a person's right

[1] Likewise, *Andrus v. Allard*, 444 U.S. 51 (1979), is inapplicable here because the regulation in that case "[did] not compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them." *Id.* at 65. The regulations at issue here require the physical surrender of a significant portion of the raisin crop to the government.

> to assert that a particular exercise of . . . regulatory power is so unreasonable or onerous as to compel compensation . . . . Were we to accept the State's rule, the postenactment transfer of title would absolve the [government] of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. [Government] would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule.

*Id.* at 627.

The Government's contention here—that the existence of intensive regulation over agriculture forbids the Plaintiffs from forming an expectation of disposing of their property and therefore forecloses a takings claim, would likewise allow the government to put an expiration date on the Takings Clause. As Professor Eagle puts it, this would create a "vicious circuity: 'A person's property is limited by an official's determination of his reasonable expectations, and his expectations are limited by the most recent statute, ordinance, or administrative ruling redefining his rights.'" Eagle, *supra*, at 537-38.

In *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005), this Court denied the government's motion to dismiss a takings claim by a company engaged in airport security screening, which suffered a loss of business rights when the government eliminated its business opportunities pursuant to a federal airport security regulation. The airport security business is certainly a heavily regulated industry. *Id.* at 446. Yet the Court found that the mere fact that the Plaintiff was aware of the regulations and of the possibility of regulatory change did not foreclose the takings claim, because "the business did not *depend* on the exercise of the government's regulatory power." *Id.* at 447. This holding was consistent with the *Nollan* Court's holding that the *Monsanto* notice rule applied only to "*Government benefit[s]*." *Nollan*, 483 U.S. at 833 n.2. *See also Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 372 (2004) (notice rule applies where taking is of "the bare receipt of benefits under a statute").

This Court distinguished cases in which the *Monsanto* notice rule had been used to dismiss takings claims brought by parties that enjoyed nothing more than a government-created benefit. *See Huntleigh USA Corp.*, 63 Fed. Cl. at 447 (distinguishing *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993), and *American Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004)). The notice rule did not apply when the business "owns its business assets and can assign, sell or transfer these assets." *Huntleigh*, 63 Fed. Cl. at 447.[2] The business' property rights were well established on a basis independent of a federally created privilege, and such property rights "cannot be illusory just because they concern activities subject to pervasive government control." *Id.*

*Huntleigh* largely relied on the Federal Circuit's decision in *Cienega Gardens*, 331 F.3d 1319. The plaintiffs in *Cienega Gardens* were property owners whose government mortgages included a provision allowing them to pay off their mortgages early. This provision was later eliminated pursuant to a federal law regulating mortgages. There was no question that property owners voluntarily participated in the government program. *See id.* at 1330. Nevertheless, the court upheld the owners' property rights in terms equally applicable to this case:

> [T]he government's position is that "enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control . . . ." To understand what is wrong with this argument it is necessary to understand the true scope of the effect implied by this viewpoint. The government, essentially, asks us to hold that *nothing* in the Owners' private mortgage agreements has any force and effect. The government, thus, advocates a legal regime that eviscerates century-old understandings of the stable and enduring nature of contract and real property rights. We take particular issue with the government's position that the Owners had no property interest because "[t]he prepayment provision contained in the [contracts] did

[2] The *Huntleigh* Court also noted that the Government was not seizing any assets in *Mitchell Arms* or *American Pelagic*. *See Huntleigh*, 63 Fed. Cl. at 447 ("The government did not take Mitchell's rifles, it merely took Mitchell's ability to market the rifles."). Here, however, the Government is requiring the Plaintiffs to turn over their tangible property.

> not exist independently of, but rather was *subject to, limited by*, and *totally dependent upon*, [the] regulatory regime, including the power of the Government to change the prepayment rules . . . ." This interpretation of the implications of a regulatory program on the existence of property interests is unwarranted . . . . The government's contention is, in effect, that Congress could retroactively alter the Owners' mortgage contracts in any way it chose without any recourse for the Owners. That cannot be, and is not, the law.

*Id.* at 1330-31.

The rule that pervasive regulation may make it impossible for a property owner to form the settled expectations that give rise to a takings claim is "limited to those cases in which the interest at issue *does not inhere to some property that the plaintiff owns independently*." *Id.* at 1336 (emphasis added). In other words, only to cases in which the claimed property right is not actually a property right, but only a government privilege. *Cf. Nollan*, 483 U.S. at 833 n.2. But the right to sell raisins that one produces *does* inhere in the property that the Plaintiffs own independently and lawfully. *Hinkle Northwest*, 641 F.2d at 1307; *Fish Bros. Wagon Co.*, 95 F. at 461.[3] Thus the fact that Plaintiffs may have been aware of the existence of the raisin cartel program cannot overcome their right to compensation for the taking of their raisins.

**III**

**THE TAKING OF PLAINTIFFS' RAISINS IS NOT "VOLUNTARY"**

The Government may not dispense with the Plaintiffs' takings claim on the basis that the raisin industry is heavily regulated already or that the raisins are "voluntarily deliver[ed] to handlers

[3] A clearer answer to the issue of when a taking pursuant to a comprehensive regulatory scheme is compensable is offered by Professor Eagle, who concludes that a property right is compensable if it is a commercial unit in itself—that is, if it can serve as a discrete, salable property in the absence of the challenged regulation. *See* Steven J. Eagle, *Regulatory Takings* § 7-7(e)(5) at 823-24 (3d ed. 2005). The only exception to this rule would be in cases where the property itself is contraband. *Cf. Allard*, 444 U.S. at 67. Since the right to sell an object is the sort of right which can itself be sold, and since raisins are not contraband, the Plaintiffs' raisins—and their right to sell them—constitute a compensable property interest.

who are subject" to the Government's confiscation scheme. Motion to Dismiss at 9. Moreover, although the Government characterizes the Plaintiffs as willing participants in the confiscation of their raisins, this "voluntariness" is illusory at best. In fact, raisin producers are subjected to regulation under the Agricultural Marketing Agreement Act whenever other raisin producers decide to petition the government for the formation of a cartel as provided for by the act. *See* Bensing, *supra*, at 10. Although the Act permits growers to vote on the adoption of a cartelizing agreement, it also allows agricultural cooperatives to bloc-vote in the referendum on behalf of all of its members, and "[b]ecause there will not infrequently be a single cooperative corporation that dominates the production of the commodity, this provision can effectively grant such cooperative veto power over the adoption or amendment of a marketing order when it elects to bloc vote." *Id.* at 13. This means that in many cases, agricultural conglomerates can override even their own members' individual preferences. *See id.* A grower who seeks to be both independent and successful is therefore inherently and systematically excluded by what amounts to an agricultural guild system. Courts have refused to enforce the voting right of dissenting growers with the same degree of scrutiny attached to the right to vote in other governmental elections. *Cecilia Packing Corp. v. USDA*, 10 F.3d 616, 624 (9th Cir. 1993). The degree of "voluntariness" involved in the act is therefore highly superficial, and dismissing a takings claim on the theory that the growers choose to participate in the program would be analogous to dismissing a claim for compensation in an eminent domain case on the theory that the property owner voted in a city council election and therefore "volunteered" to have his property taken from him.

## CONCLUSION

Plaintiffs produce raisins through their own labor, ingenuity, and investment. But every year, a government agency, at the behest of a conglomerate of competing raisin producers, seizes a

substantial portion of their crop—sometimes almost half of it—so as to create artificial scarcity and increase the price of raisins. It does not compensate the Plaintiffs for their raisins. Yet the Fifth Amendment commands that when private property is taken for public use, the government must pay just compensation. The Plaintiffs have stated a cause of action which cannot be defeated on the basis that the Plaintiffs "choose" to participate in this program, or that this program has existed for a long time. The Government's motion to dismiss should be *denied.*

DATED: August 29, 2006.

Respectfully submitted,

JAMES S. BURLING, *Attorney of Record*
TIMOTHY SANDEFUR, *Of Counsel*

By s/ James S. Burling
JAMES S. BURLING

Pacific Legal Foundation
3900 Lennane Drive, Suite 200
Sacramento, California 95834
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
*Attorneys for Amicus Curiae*
*Pacific Legal Foundation*

## CERTIFICATE OF FILING

I hereby certify that on August 29, 2006, a copy of the foregoing BRIEF OF AMICUS CURIAE PACIFIC LEGAL FOUNDATION IN OPPOSITION TO MOTION TO DISMISS was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By s/ James S. Burling
JAMES S. BURLING