**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **Evans, et al.** | **Case No. 1:06-cv-00439-CFL** |
| **Plaintiff(s),** | **Charles F. Lettow, Presiding** |
| **v.** | **Plaintiffs' Motion for Leave to File Sur-Reply Brief, and Sur-Reply Brief Opposing Defendant's Motion to Dismiss** |
| **United States of America,** | |
| **Defendant.** | |

**Plaintif's Motion for Leave to File Sur-Reply Brief**

1. Plaintiffs respectfully request leave of this Court to file a Sur-Reply Brief.

2. The basis for this Motion is:

   2.1. Defendants assert Plaintiffs admit market participation is voluntary, which is untrue;

   2.2. Defendants rely heavily on the 12 year old *Cal-Almond*[1] decision of this Court, but misrepresent the nature of that case;

   2.3. Plaintiffs recently procured a government Brief from the *Cal-Almond* case, *supra*, showing its substantial distinguishing factors from this case on the *per se* takings issue.

3. The Court should have the benefit of this authority in making its determination on this issue of substantial public concern.

**Plaintiff's Sur-Reply Brief**

4. The Government wrongly asserts that Plaintiffs' admit to voluntarily subjecting their raisins to regulatory action by delivering them to a handler. (Doc 9, p 1).

---

[1] *Cal-Almond, Inc. v. United States*, 30 FedCl 244 (1994), aff'd 73 F.3d 381 (Table) (Unpublished Disposition), *cert denied*, 519 U.S. 963 (1996).

5. Plaintiffs have shown they have three options for disposing of their raisins. Assuming Named Plaintiff Joyce Evans has one hundred (100) acres in raisin production, she has three raisin disposal options:

5.1. Ms. Evans can eat all her raisins on site, thereby avoiding the Raisin Marketing Order;

5.2. Ms. Evans can clean, stem, sort and pack her own raisins for sale to the public, thereby subjecting herself to the Marketing Order as a "handler"[2];

5.3. Sell their raisins to a raisin packer/handler, subjecting herself to the Raisin Marketing Order.

6. The only means to avoid the Volume Control Regulations of the Raisin Marketing Order is to personally consume the raisins on site, which is of course not practical. No voluntary action exists.

**The *Cal-Almond* Case Does Not Apply**

7. There are three primary distinctions between this case and the *Cal-Almond* case cited by the Government in its Reply Brief.

7.1. This case is brought by producers, while the *Cal-Almond* plaintiffs were handlers;

7.2. This case shows a forced title transfer from producers to the government, while no forced title transfer was found in the differing regulations analyzed in *Cal-Almond*, which only altered marketing options without transferring title to the Government or its agent;

[2] Plaintiffs' Brief in Opposition to Motion to Dismiss showed the Government's position that a raisin producer cannot process his/her own raisins, rather than selling to a packer, and avoid the Raisin Marketing Order. Rather the Government's position is a producer becomes a handler subject to the Volume Control Regulations of the Raisin Marketing Order when packing his/her own raisins for sale to the public. (Document 6, p. 12).

7.3. This is a per se takings case, while *Cal-Almond* was a regulatory takings case.

Difference in Plaintiff Status or Capacity

8. First, the *Cal-Almond* case was brought by almond handlers, not producers asserting a taking of the handlers' almonds occurred pursuant to the Federal Almond Marketing Order. *Cal-Almond, Inc. v. United States*, 30 Fed Cl 244 (1994). The almond handler plaintiffs in that case were Cal-Almond, Inc., Gold Hills Nut Company, Saulsbury Orchards, and Almond Processing. *Id*. at 244.

Difference in Title Transfer

9. Second, the *Cal-Almond* Court never found there was a title transfer from almond handler plaintiffs to a government agent, such as the Raisin Administrative Committee here. The almond handlers had already received title to the almonds from almond producers. The almond reserve program allowed handlers a choice of "(i) deliver[ing] the required percentage to the Almond Board for sale into non-competitive channels, with the net proceeds of the sale being remitted to the handler, . . . or (ii) retain[ing] the reserve almonds and, at the same time, enter into an 'agency agreement' with the Almond Board agreeing to dispose of the almonds in non-competitive outlets." *Id*. at 245. No forced title transfer occurred in *Cal-Almond*. Rather handlers retained title and were merely restricted in marketing methods.

10. The Government's Brief in the *Cal-Almond* case, which is electronically attached, repeatedly asserted there was no almond title transfer from plaintiff handlers to the Government. The Government then stated:

> Handlers are not required to, and do not, transfer title in the almonds. … If a handler exercises its option to sell the reserves in a non-competitive market instead of turning them over to the Almond Board, the handler itself determines in which reserve outlet it will market the almonds . . . Moreover, the handler retains continual physical control and custody over the almonds once a reserve is announced, unless it elects to turn the almonds over to the Almond Board. . . . .

> Significantly, handlers receive all proceeds for the sale of almonds held in reserve. . . .
>
> Furthermore, it is also undisputed that once a reserve is lifted, handlers receive all proceeds from the sale of those almonds that had been held in reserve. However, plaintiffs have provided no explanation regarding how "title" and "transfers back to handlers once a reserve is lifted." The obvious answer is that they never lose title in the first place because the mere regulation of the marketing of the almonds does not confer title in the government.

(Attachment 1, Defendants' Cross Motion for Summary Judgment in response to Plaintiff's Motion for Summary Judgment, pp 28-29, *Cal-Almond, Inc., et al. v. United States*, U.S. Court of Federal Claims, No. 92-477C.)

11. The government's *Cal-Almond* Brief, further argued that the Reserve Almond Program often resulted in elimination of the reserves some time after the reserves were announced. Regarding the *per se* takings issue, the government stated:

> None of the almonds which were released from these reserves were ever used by the government or any other entity, for any purpose. Instead Plaintiffs [handlers] received open market prices for those almonds, if and when they were able to sell them in that market. What the government obtained as a result of the reserves was not the use or "occupation" of Plaintiffs' property, but control over the marketing of an agricultural product, for a regulatory purpose and pursuant to a regulatory scheme.
>
> Similarly, the small percentage of almonds that were not eventually released into the open market were released into alternate markets, . . . .
>
> . . . Clearly, although reserved almonds that are not released into the open market are sold at a lower price and alternate outlets, these almonds were not expropriated for "public use."

(Attachment 1, pp 31, 32, 33.)

12. Here, title is transferred from producers to the RAC upon delivery to a raisin packer or handler. 7 CFR § 989.66(a) ("The standard raisins acquired by a

handler which are designated as reserve tonnage… shall be held by him for the account of the [RAC]… .”). The RAC, as the new owner, can then collateralize the reserve raisins to obtain loans (7 CFR § 989.66(g)), require the handler to deliver the raisins to RAC (7 CFR § 989.66(b)(4)), or sell the raisins back to handlers (7 CFR 989.66(e)). The RAC receives all proceeds from the sale of the Reserve Raisins transferred to it by Plaintiffs and other raisin producers.

13. The U.S. Court of Appeals, Federal Circuit, has determined the Volume Control Regulations cause title transfer from producers to the Raisin Administrative Committee (RAC), producers no longer have a property interest in the raisins, and the RAC is an agent of the United States. *Lion Raisins, Inc. v. United States*, 416 F3d 1356, 1368, 1369 fn9 (FedCir 2005).[3]

14. The handlers are “compensated for receiving, storing, fumigating, handling, and inspection” of the Reserve Raisins “held by them for the account of the” RAC (7 CFR 989.66(f)), but never obtain title to the raisins.

15. Producers merely retain an equity interest in a raisin Reserve Pool which is, in practice, valueless. Producers are never allowed to sell their raisins in an alternative market, receive proceeds from their raisins, or receive a return of the physical raisins.

<u>Difference in Regulatory vs. Per Se Taking Analysis</u>

16. Third, the *Cal-Almond* Court, at both the Court of Federal Claims and the Federal Circuit (unpublished disposition) levels, therefore analyzed the action as a regulatory, not a per se, takings case because no property transfer occurred. *Cal-Almond, Inc., supra*, 30 FedCl 244, 246-247; *Cal-Almond, Inc, supra*, 73 F3d 381 (Table). The Government argued, in that case, in for the regulatory takings analysis in this way:

> The inapplicability of the <u>Loretto</u> “*per se*” Rule is further underscored by the weakness of Plaintiffs’ asserted factual basis for applying the <u>Loretto</u> holding here. Plaintiffs

[3] Lion Raisins, Inc. and Lion Brothers brought the takings claim in their producer, not handler, capacities. *Id*.

> repeatedly assert that almonds held in reserve "belong to" or "are owned by the Almond Board and the Secretary of Agriculture" and are, therefore, expropriated in a manner which requires the application of the "*per se*" Rule. This assertion is incorrect. The mere fact that almond handlers are required to abide by the annual reserve requirement . . . does not establish that ownership of the almonds transfers to the Secretary or the Almond Board.

(Attachment 1, p. 27).

17. Because the Volume Control Regulations of the Raisin Marketing Order cause a title transfer from producers to the RAC as an agent of the United States, the *Loretto* "per se" rule should be applied. Upon producer delivery to handlers, the RAC becomes the new owner of the raisins, sells the raisins to fund its program activities, and producers receive nothing.

18. The government's Motion to Dismiss should be denied.

September18, 2006.

Named Plaintiffs,

By: s/ Michael C. Stumo__________

Michael C. Stumo (Attorney of Record)
David A. Domina (Of Counsel)
DOMINALAW Group pc llo
2425 S. 144th Street
Omaha, NE 68144-3267
(402) 493-4100
mstumo@dominalaw.com
efiling@dominalaw.com

Brian C. Leighton (Of Counsel)
701 Pollasky Avenue
Clovis, CA 93612
(559) 297-6190
bleighton@arrival.net

*Attorneys for the Named Plaintiffs*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **Evans, et al.** | **Case No. 1:06-cv-00439-CFL** |
| **Plaintiff(s),** | **Charles F. Lettow, Presiding** |
| **v.** | **Certification of Service** |
| **United States of America,** | |
| **Defendant.** | |

I hereby certify that on September 18, 2006, I filed **Plaintiffs' Motion for Leave to File Sur-Reply Brief, and Sur-Reply Brief Opposing Defendant's Motion to Dismiss** with the Clerk of the Court using the CM/ECF system, which sent notification of such filing all to counsel of record.

**s/ Michael C. Stumo**
Michael C. Stumo
Counsel of Record for Named Plaintiffs