IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CAL-ALMOND, INC., a California corporation, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 92-477C (Judge Wiese) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGEMENT

Pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims, defendant respectfully requests summary judgment upon the grounds that there is no genuine issue as to any material fact and that the United States is entitled to judgment as a matter of law.[1] In support of this cross-motion, defendant relies upon the complaint, defendant's proposed findings of uncontroverted fact, and the following brief and appendix.

## DEFENDANT'S BRIEF

### Nature of the Case

Plaintiffs are handlers and growers of almonds in the State of California. They each request money damages pursuant to the fifth amendment of the United States Constitution, based upon

Exhibit 1 to Plaintiffs' Sur-Reply Brief Opposing Motion to Dismiss

[1] In light of the decisions in Borough of Alpine v. United States, 923 F.2d 170, 171 n.1 (1991), and Essex Electro Engineers, Inc. v. United States, 22 Cl. Ct. 757, 759 (1991), we have treated our motion as one for summary judgment rather than as a motion to dismiss.

This rationale by the Supreme Court clearly defeats plaintiffs' argument that a "per se taking" has occurred because a small percentage of the almonds held in reserve are sold to third parties with whom they do not wish to do business.

2. The Facts Of This Case Do Not Support A Finding Of A "Per Se" Taking

The inapplicability of the Loretto "per se" rule to this case is further underscored by the weakness of plaintiffs' asserted factual basis for applying the Loretto holding here. Plaintiffs repeatedly assert that almonds held in reserve are possessed and owned by the Almond Board and the Secretary of Agriculture, Mot. 40, 44, and are, therefore, expropriated in a manner which requires the application of the "per se" rule. This assertion is incorrect. The mere fact that almond handlers are required to abide by the annual reserve requirement imposed by the Secretary does not establish that ownership of the almonds transfers to the Secretary or the Almond Board.

"[T]he state's power to regulate is not ownership. Nor does the fact that a state has regulated an object in and of itself constitute ownership [of that object]." United States v. McClain, 545 F.2d 988, 1002 (5th Cir. 1977). The exercise of control over the marketing of an agricultural product through regulation simply does not constitute the expropriation of that product. See United States v. Locke, 471 U.S. 84, 107 (1985) ("Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations

can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed").

Handlers are not required to, and do not, transfer title in the almonds. Plaintiffs have cited no legal authority which supports their contrary position. In fact, handlers are simply required to "comply with the requirements in respect to withholding reserve almonds and the prescribed disposition thereof." 7 C.F.R § 981.46. If a handler exercises its option to sell the reserves in a noncompetitive market instead of turning them over to the Almond Board, the handler itself determines in which reserve outlet it will market the almonds. 7 C.F.R. § 981.67; App. 24-25.[9] Moreover, the handler retains continual physical control and custody over the almonds once a reserve is announced, unless it elects to turn the almonds over to the Almond Board. 7 C.F.R. § 981.52.[10] Plaintiffs concede that this is the case. Mot. 20.

Significantly, **handlers receive all proceeds for the sale of almonds held in reserve.** Although plaintiffs assert that the Secretary and the Almond Board obtain the interest in the almonds

---

[9] See 55 Fed. Reg. 38793, 38795 (Sept. 21, 1990) (an agency agreement "is a voluntary contract with the Board signed by handlers who wish to dispose of their reserve almonds on their own rather than through the Board").

[10] Plaintiffs cite the language of section 981.52, which requires handlers to hold the almonds in storage "for the account of the Board," as evidence that ownership of the reserve almonds passes to the Almond Board. Mot. 9, 20. This phrase, however, does not denote ownership, but merely requires handlers to segregate almonds held in reserve, for purposes of inspection and record-keeping. See 7 C.F.R. §§ 981.10, 981.56, 981.71.

once a reserve is announced, Mot. 46, and that every strand of their bundle of rights to the almonds is severed, Mot. 46, they completely ignore the fact that it is the handlers, and not the Secretary or the Almond Board, that receive all proceeds from the sale of the reserve. Section 981.66, which addresses reserve almonds held by the Board, specifically provides that "[n]et proceeds from the disposition of reserve almonds by the Board **shall be distributed to each handler** in proportion to his relative share of such disposition . . . ." 7 C.F.R. § 981.66(g) (emphasis added). Similarly, section 981.67, which addresses the disposition of almond reserves held by a handler, provides that "[t]**he proceeds of such disposition shall be retained by the handler making the disposition . . . .**" 7 C.F.R. § 981.67 (emphasis added). If, as plaintiffs assert, they had no title or ownership rights to the reserve almonds, Mot. 40, 46, they would have had no entitlement to the proceeds from the sale of those almonds. It is, therefore, clear that plaintiffs did retain ownership of the almonds even though they were held in reserve.

Furthermore, it is also undisputed that once a reserve is lifted, handlers receive all proceeds from the sale of those almonds that had been held in reserve. However, plaintiffs have provided no explanation regarding how "title" transfers back to handlers once a reserve is lifted. The obvious answer is that they never lose title in the first place, because the mere regulation of the marketing of the almonds does not confer title in the Government. McClain, 545 F.2d at 1002.

Finally, as a factual matter, there was no permanent physical occupation of plaintiffs' property. Although inspections by the Department of Agriculture or audits by the Almond Board may have necessitated a temporary physical presence upon plaintiffs' property, defendant never physically controlled or appropriated plaintiffs' land or their almonds. Because of the regulated nature of the almond industry, such temporary incursions upon plaintiffs' property clearly do not rise to the level of a physical taking under the fifth amendment. California Housing Securities, 959 F.2d at 958; Golden Pacific Bancorp, 25 Cl. Ct. at 770.

3. Plaintiffs' Almonds Were Not Subjected To "Public Use," But Were Controlled For A Regulatory Purpose

Plaintiffs' argument also ignores "the age-old distinction between regulation and public use." Troy Ltd. v. Renna, 727 F.2d 287, 301 (3d. Cir. 1984). That the Almond Board did not "occupy" the almonds held in reserve is demonstrated by the fact that the reserve almonds were not subjected to "public use," as contemplated pursuant to the takings clause. In Loretto, the intrusion by the cable company consisted of more than a mere presence of employees or equipment; the company **used** the subject property for its own benefit and that of its customers, and it was for this use that the owner was found entitled to compensation. Similarly, in the other cases cited by plaintiffs in which a taking was found based upon a physical occupation of

real property, the property was occupied for the use or benefit of the occupier.

Here, however, "the United States has taken nothing for its own use," Connolly v. Pension Benefit Guaranty Corp., 475 U.S. at 224-25, nor for the use of any other entity. In fact, the majority of the almonds held in reserve were released into the open market during the course of the crop years which are the subject of this litigation. For example, although a 25 percent reserve was announced in 1984, 49 Fed. Reg. 38530 (Nov. 1, 1984), that reserve was reduced to five percent by June, 1985. 50 Fed. Reg. 24175 (June 10, 1985). Also, the reserve for the 1985-86 crop year was reduced from twenty percent to 10 percent, Plaintiff's Exhibit ("Pl. Ex.") 5, p. 5; the 18 percent reserve announced for the 1987-88 crop year was completely eliminated, 53 Fed. Reg. 28630 (July 29, 1988); the 25 percent reserve announced for the 1988-89 crop year was also completely eliminated, 54 Fed. Reg. 31502 (July 31, 1989); and the reserve for the 1990-91 crop year was drastically reduced from 35 percent to seven percent, 56 Fed. Reg. 29559 (June 28, 1991).

None of the almonds which were released from these reserves were ever used by the Government or any other entity, for any purpose. Instead, plaintiffs received open market prices for those almonds, if and when they were able to sell them in that market. What the Government obtained as a result of the reserves was not the use or "occupation" of plaintiffs' property, but

control over the marketing of an agricultural product, for a regulatory purpose and pursuant to a regulatory scheme.[11]

Similarly, the small percentage of almonds that were not eventually released into the open market **were** released into alternate markets, for the stated purpose of developing these new markets and expanding the demand for almonds, **for the future benefit of the almond industry**. Thus, in announcing the 1982 two percent reserve, the Department of Agriculture explained that:

> These almonds will be available to develop outlets noncompetitive with normal domestic and export outlets. The development of such outlets **is a long-term necessity for the industry because of anticipated larger crops.** The Board plans to use the reserve to develop a market for almond butter and has presented an industry-wide project. **The Board's objective is to develop a permanent consumer demand for almond butter and related products that, in time, will absorb a large quantity of almonds.**

47 Fed. Reg. 42960, 42961 (Sept. 30, 1982) (emphasis added). Thus, rather than merely storing or destroying reserve almonds, the Department of Agriculture and the Almond Board have used the reserves to transform these new markets into outlets for salable

---

11 The regulatory purpose of the control exercised here is an important factor distinguishing this case from cases such as Pewee Coal, 341 U.S. 114, where the Court found a compensable taking. In Pewee Coal, the Government took control of a coal producer during war time, to assure the country's continued access to coal; that is, the Government took over the coal company's property in order to **use** it as a source of coal. In this case, the reserves imposed by the Department of Agriculture are not used as a source of almonds, but are merely intended to regulate the marketing of the product.

almonds at normal market prices. 55 Fed. Reg. 38793, 38795 (Sept. 21, 1990).[12]

Clearly, although reserved almonds that are not released into the open market are sold at a lower price in alternate outlets, these almonds were not expropriated for "public use." Instead, they are used to develop and benefit the almond industry. A compelling example of this use of the almond reserves was the implementation of almond reserves during the 1950's and 1960's to develop foreign markets and other "non-competitive" outlets.

During that period, the domestic market was the primary outlet, and supplies in excess of normal domestic needs moved to export or other "non-competitive" uses, such as the sale of sliced, diced, and slivered almonds. App. 1.[13] As is the practice today, the price for almonds in the developing markets (e.g., the export market) was set lower than the price for the domestic open markets, in order to develop the new market. App. 10. In the period between the implementation of the Almond Marketing Order upon the 1950 crop and 1964, there were only four years when all of the crop was declared salable in the open market. App. 18, 22. The most frequently established reserve

---

12 Plaintiffs' contention that the reserves imposed from 1982 through 1985 were not used "to raise parity prices to growers, but instead to explore creating the end use of almond butter," Mot. 67, is short-sighted. The Secretary and the Almond Board have a reasonable belief that the development of future markets is necessary to maintain the price of almonds in future years, in light of growing crop yields. App. 19-23.

13 "App. ___" refers to the appendix attached to this brief.

Respectfully submitted,

STUART M. GERSON
Assistant Attorney General

DAVID M. COHEN
Director

TERRENCE S. HARTMAN
Assistant Director

ROBERT E. KIRSCHMAN, JR.
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
2nd Floor, Todd Building
Washington, D.C. 20530
Tele: (202) 307-0844

Attorneys for Respondent

OF COUNSEL:

FRANK MARTIN, JR.
Attorney
United States Department of Agriculture
Office of the General Counsel
Marketing Division
Room 2014-South
Washington, D.C. 20250-1400

January 25, 1993