# In the United States Court of Federal Claims

No. 06-439C

(Filed: December 22, 2006)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * ) | |
| ) | Takings Clause; Commerce Clause; |
| JOYCE EVANS, *et al.*,  ) | Agricultural Marketing Agreement Act |
| ) | of 1937; motion to dismiss for failure |
| Plaintiffs,  ) | to state a claim; RCFC 12(b)(6) |
| ) | |
| v.  ) | |
| ) | |
| UNITED STATES,  ) | |
| ) | |
| Defendant.  ) | |
| ) | |
| ) | |
| * * * * * * * * * * * * * * * * * * * * | |

      David A. Domina, DominaLaw Group, PC, LLO, Omaha, Nebraska, for plaintiffs.  On the briefs was Michael C. Stumo, DominaLaw Group, PC, LLO, Omaha, Nebraska.  Of counsel were Claudia L. Stringfield-Johnson, DominaLaw Group, PC, LLO, and Brian C. Leighton, Law Offices of Brian C. Leighton, Clovis, California.

      Timothy P. McIlmail, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, Commercial Litigation Branch, and Mark A. Melnick, Assistant Director, Civil Division, United States Department of Justice, Washington, D.C.

      James S. Burling, Principal Attorney, Pacific Legal Foundation, Sacramento, California, for *amicus curiae* Pacific Legal Foundation.  Of counsel was Timothy Sandefur, Attorney, Pacific Legal Foundation, Sacramento, California.

**OPINION AND ORDER**

LETTOW, Judge.

      Plaintiffs are raisin growers in California who claim that the United States, in its implementation of the Agricultural Marketing Agreement Act of 1937 ("Agricultural Marketing

Act"), Pub. L. No. 75-137, 50 Stat. 246 (codified as amended at 7 U.S.C. §§ 601-74), by promulgating the currently effective raisin marketing order under the statute, has taken their property without just compensation in contravention of the Fifth Amendment of the United States Constitution.  The Agricultural Marketing Act authorizes the Secretary of Agriculture (the "Secretary") to issue marketing orders for various agricultural products, including raisins, in an effort to limit the supply of such products on the open market and thus to stabilize prices.  The raisin marketing order does not explicitly regulate raisin producers (*i.e.,* growers), but it imposes draconian regulations on handlers – those who stem, sort, clean, seed, package, or process raisins – by requiring them to transfer to the government's Raisin Administrative Committee ("RAC") an annually specified portion of the raisins they buy from producers.  Specifically, handlers must physically separate these "reserve tonnage" raisins for the government from the remaining "free tonnage" raisins, which handlers may sell on the open market.  The marketing order in effect causes handlers to purchase from producers only the "free tonnage" raisins, with producers receiving an equity interest in the "reserve tonnage" raisins in the government's hands.  The RAC may sell or dispose of "reserve tonnage" raisins in secondary, non-competitive markets, and must pay over to the equity-interest holders any net proceeds remaining after it has completed its operations for any given crop year.

      Plaintiffs filed their complaint on June 1, 2006, alleging that the Agricultural Marketing Act and regulations promulgated under that Act, including the currently effective raisin marketing order, result in an uncompensated taking of the "reserve tonnage" portion of the raisins they transfer to handlers.  Compl. ¶¶ 46-47, 2, 27.  In further support of their claim, plaintiffs assert that their equity return on the net proceeds from the sale of these "reserve tonnage" raisins has been worthless or nearly so in recent years.  *Id.* ¶ 45.  Plaintiffs seek certification as a class, a declaration that the statutory and regulatory bases for the marketing order violate the Fifth Amendment, an injunction to prevent the United States Department of Agriculture ("USDA") from enforcing the raisin marketing order, and damages.  *Id.* ¶¶ 15-20, 51.

      The government has filed a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), contending that plaintiffs have not presented a cognizable takings claim.  Def.'s Mot. to Dismiss at 4.  Plaintiffs have responded by arguing that the government has mischaracterized their claim as a regulatory taking, rather than a *per se* physical taking, and that the federal government's authority under the Commerce Clause to regulate interstate commerce does not trump the Takings Clause of the Fifth Amendment.  Pl.'s Brief Opposing Def.'s Mot. to Dismiss ¶¶ 1, 14, 29.  The Pacific Legal Foundation has filed a brief as *amicus curiae* in support of plaintiffs, averring that the raisin marketing order confers no benefit on plaintiffs and imposes an involuntary transfer of a portion of plaintiff's raisins to the government.  Briefing has been completed and the court has held a hearing on the pending motions.  For the reasons set out below, the government's motion to dismiss is granted.

**BACKGROUND**[1]

In the midst of the Great Depression, Congress passed the Agricultural Marketing Act, which sought to address "the disruption of the orderly exchange of commodities in interstate commerce [that] impair[ed] the purchasing power of farmers and destroy[ed] the value of agricultural assets." Agricultural Marketing Act, 50 Stat. at 246. The Act authorizes the Secretary to promulgate marketing orders for raisins, among other agricultural commodities, restricting the amount of raisins from a given crop year that raisin handlers in California may sell on the open market. *See* 7 U.S.C. § 608c(1), (2), (6)(C); *see also* 7 C.F.R. §§ 989.4, 989.65, 989.66(a)-(b)(1), 989.257 (2006).[2]

Under the Agricultural Marketing Act, the Secretary may delegate to industry committees the power to administer marketing orders, and these committees may recommend to the Secretary changes to existing orders. 7 U.S.C. § 608c(7)(C); *see* 7 C.F.R. § 989.35 (2006).[3] The raisin marketing order, originally issued in 1949, Handling of Raisins Produced from Raisin Variety Grapes Grown in California, 14 Fed. Reg. 5136 (Aug. 18, 1949) (codified, as amended, at 7 C.F.R. Part 989), created the RAC, a raisin industry group currently composed of forty-seven members, including thirty-five who represent producers, ten who represent handlers, one who represents a cooperative bargaining association, and one who represents the public. *See* California Raisin Marketing Order, 71 Fed. Reg. 4805, 4805-06 (Jan. 30, 2006). The RAC is an agent of the federal government, *see Lion Raisins, Inc., v. United States,* 416 F.3d 1356, 1368 (Fed. Cir. 2005) ("*Lion Raisins III*"), whose members are nominated by industry groups and appointed by the Secretary. 7 C.F.R. §§ 989.26, 989.29, 989.30. The RAC receives no federal appropriations, but is funded by assessments levied on handlers and proceeds from the sales of "reserve tonnage" raisins withheld from the open market. *See* 7 C.F.R. §§ 989.53, 989.79, 989.80(a), 989.82.

---

[1]The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' pleadings and other filings and are either undisputed or are alleged and assumed to be true for purposes of the pending motion.

[2]Section 8c of the Agricultural Marketing Act, 7 U.S.C. § 608c, the key statutory provision dealing with the marketing orders, originated in a 1935 amendment to the Agricultural Adjustment Act of 1933, Pub. L. No. 73-10, 48 Stat. 31. *See* Act of Aug. 24, 1935, Pub. L. No. 74-320, § 5, 49 Stat. 750, 753-61. The Agricultural Marketing Act reenacted much of the Agricultural Adjustment Act, including Section 8c. *See* Agricultural Marketing Act, § 1(e), 50 Stat. at 246.

[3]References to the raisin marketing order and to other USDA regulations are to those revised as of January 1, 2006, unless otherwise noted.

By February 15 of each crop year,[4] the RAC must recommend to the Secretary the portion of the raisin crop that should be made available for sale without restrictions ("free tonnage" raisins) and the portion that should be withheld from the market ("reserve tonnage" raisins).  *See* 7 C.F.R. §§ 989.54(d), 989.65.  Based on the RAC's recommendations and after obtaining the approval of two-thirds of the raisin producers[5] or of producers of two-thirds of the raisins "produced for market," the Secretary promulgates a regulation fixing the percentages of "reserve tonnage" and "free tonnage" raisins.  7 U.S.C. § 608c(8)(A)-(B), (9)(B)(i)-(ii); 7 C.F.R. §§ 989.55, 989.65.

Using a reserve pool mechanism, the raisin marketing order requires handlers[6] to separate the raisins they purchase from producers (*i.e.,* raisin growers) into two discrete sets of bins: one for "free tonnage" raisins and the other for "reserve tonnage" raisins.  7 C.F.R. §§ 989.54, 989.55, 989.65, 989.66(b)(2).  Upon delivery to a handler, title to the "free tonnage" raisins passes to the handler, but title to the "reserve tonnage" portion of a producer's raisins automatically transfers to the RAC for sale in secondary, non-competitive markets.  *See* 7 C.F.R. §§ 989.65, 989.66(a), (b)(1), (4) ("reserve tonnage" raisins acquired by a handler "shall be held by him for the account of the [RAC]").[7]  Producers are entitled by regulation to an equitable distribution of the net proceeds from the RAC's disposition of the "reserve tonnage" raisins.  *See*

---

[4]The raisin crop year runs from August 1 of a given year until July 31 of the next year.  *See* 7 C.F.R. § 989.21.

[5]A producer is "any person engaged in a proprietary capacity in the production of grapes which are sun-dried or dehydrated by artificial means until they become raisins."  7 C.F.R. § 989.11.

[6]A handler is "(a) [a]ny processor or packer; (b) any person who places, ships, or continues natural condition raisins in the current of commerce from within the area to any point outside thereof; (c) any person who delivers off-grade raisins, other failing raisins or raisin residual material to other than a packer or other than into any eligible non-normal outlet; or (d) any person who blends raisins [subject to certain exceptions]."  7 C.F.R. § 989.15.  A processor is any person who receives raisins and uses them in California to make a product other than raisins for marketing or distribution.  7 C.F.R. § 989.13.  A packer is "any person who, [in California], stems, sorts, cleans, or seeds raisins, grades stemmed raisins, or packages raisins for market as raisins," but does not include a producer who sorts and cleans unstemmed raisins.  7 C.F.R. § 989.14.

[7]The RAC may dispose of "reserve tonnage" raisins in non-competitive markets by sale to handlers serving specified outlets or for resale to exporters for sales abroad, by direct sale to the United States or foreign governments, by gift, or by any other means consistent with 7 U.S.C. § 608c.  7 C.F.R. § 989.67(b).  Plaintiffs allege that proceeds from "reserve tonnage" raisins are used to subsidize raisin packers' exports and school lunch programs, as well as to fund more than half of the RAC's budget.  Compl. ¶¶ 37, 44.

7 C.F.R. §§ 989.66(h); *see also* Raisin Administrative Committee, *Analysis Report* 10 (2001), available at http://www.raisins.org ("Funds generated from reserve pool sales programs, net of costs, become the growers' equity."). The RAC usually needs several years to dispose of the "reserve tonnage" raisins for a given year. *See* California Raisin Marketing Order, 71 Fed. Reg. at 4806. As a result of these restrictions, handlers pay producers for the "free tonnage" portion of the raisins, but not for the "reserve tonnage" raisins. Compl. ¶ 27; *Lion Raisins* III, 416 F.3d at 1360.[8]

The Agricultural Marketing Act explicitly excludes raisin producers from regulation, 7 U.S.C. § 608c(13)(B), but the expansive regulatory definition of a handler, *see supra* at 4 n.6, captures within its scope any producer who seeds, grades, packages, or stems raisins or places raisins into interstate commerce. *See* 7 C.F.R. §§ 989.14, 989.15. The government may seek injunctive relief, as well as civil and criminal penalties, against handlers who violate the raisin marketing order. *See* 7 U.S.C. §§ 608a(5), 608a(6), 608c(14); *see also In re Saulsbury Enters., Inc.,* 55 Agric. Dec. 6, 7, 17 (May 7, 1996) (holding that a raisin producer who shipped largely uncleaned raisins to Canada was a handler subject to civil penalties for violating a raisin marketing order); 7 C.F.R. § 989.166(c) (providing that a handler who refuses to turn over his "reserve tonnage" raisins to the RAC shall compensate the RAC according to the market price for such raisins).

The raisin marketing order shares many of the characteristics of marketing orders for other agricultural products. *Compare* 7 C.F.R. Part 989 (Raisin Marketing Order), *with* 7 C.F.R Parts 930 (Tart Cherry Marketing Order), 981 (Almond Marketing Order), 984 (Walnut Marketing Order), 985 (Spearmint Oil Marketing Order), 993 (Prune Marketing Order).[9] Like other such orders, the raisin marketing order grants to the industry committee, the RAC, the power to sell or dispose of all of the reserves, *compare* 7 C.F.R. § 989.67(a) (raisins), *with* 7 C.F.R. §§ 981.66(a) (almonds), 984.56 (walnuts), 993.65(a) (prunes), and also gives either handlers or producers a proportional interest in the net proceeds from any reserve sales. *Compare* 7 C.F.R. § 989.65(e) (raisins), *with* 7 C.F.R. §§ 981.66(e) (almonds), 984.56(e) (walnuts), 993.65(e) (prunes). Nonetheless, the raisin marketing order stands out from most of its counterparts in two respects: it effects a direct transfer of title of a producer's "reserve tonnage" raisins to the government, and it requires physical segregation of the reserve-tonnage raisins held for the government's account. 7 C.F.R. §§ 989.54, 989.55, 989.65, 989.66(b)(2).

---

[8]The price handlers pay producers for "free tonnage" raisins is negotiated privately by handlers' and packers' bargaining associations. *See Lion Raisins III*, 416 F.3d at 1360; Compl. ¶ 24 & n.4.

[9]Pursuant to 7 C.F.R. § 993.90(a), the handling requirements for the marketing order for prunes were suspended indefinitely by the Secretary in August 2005. *See* Dried Prunes Produced in California; Suspension of Handling and Reporting Requirements, 70 Fed. Reg. 50,153 (Aug. 26, 2005); *see also* Dried Prunes Produced in California; Suspension of Handling and Reporting Requirements, 70 Fed. Reg. 30,610 (May 27, 2005).

Marketing orders for agricultural products have been controversial, and considerable litigation has recently arisen about them. Recently, the raisin marketing orders have been a focal point for such litigation. In 2005, the Federal Circuit decided *Lion Raisins III*, 416 F.3d 1356, a consolidated appeal of two cases in which Lion Raisins, Inc. ("Lion"), a raisin producer and handler, mounted Fifth Amendment takings challenges that were related to those in this case, but that relied on different substantive allegations. In *Lion Raisins, Inc. v. United States,* 58 Fed. Cl. 391 (2003) ("*Lion Raisins I*"), Lion, in its capacity as a producer, alleged that the RAC's use of proceeds from 1997 "reserve tonnage" raisins to finance export programs during the 1998 and 1999 crop years constituted a taking entitling it to just compensation. *Lion Raisins III*, 416 F.3d at 1361. Lion claimed that the RAC had violated the Agricultural Marketing Act and the pertinent raisin marketing order by not transferring to Lion its equitable share in the 1997 reserve pool. *Id.* at 1369. The Federal Circuit affirmed dismissal of Lion's suit on the ground that "a claim premised on a regulatory violation does not state a claim for a taking" in the Court of Federal Claims. *Id.*; *see also Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1366 (Fed. Cir. 2001) (noting that a takings claim premised on an alleged statutory or regulatory violation does not state a claim cognizable in the Court of Federal Claims under the Tucker Act because suits for just compensation in the Court must rest on a taking for public use, the legality of which is not challenged). In commenting on an additional claim made by Lion that a change in the reserve pool benefits constituted a physical taking of the plaintiff's raisins, the Federal Circuit remarked that "once the raisins were transferred to the RAC, Lion no longer had a property interest in the raisins themselves, but only in its share of the reserve pool proceeds as defined by the regulations." *Lion Raisins III*, 416 F.3d at 1369 n.9 (citing 7 C.F.R. § 989.66(h)).

In the companion case, *Lion Raisins, Inc. v. United States,* 57 Fed. Cl. 435 (2003) ("*Lion Raisins II*"), Lion, in its capacity as a handler, pressed a Fifth Amendment takings claim by alleging that the RAC had not returned raisin bins in which Lion had transferred reserve raisins to the RAC. *Lion Raisins III,* 416 F.3d at 1361, 1370. Lion sought compensation for the bins and for a rental fee for the RAC's use of the bins. *Id.* at 1361. The Federal Circuit affirmed the dismissal of this suit as well, stressing that 7 U.S.C. § 608c(15) provides an administrative remedy for any handler who alleges that "any [] order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law." *Id.* at 1370. Noting that the Supreme Court described 7 U.S.C. § 608c(15) as providing an explicit remedy to an aggrieved handler, *id.* at 1371 (citing *United States v. Ruzicka*, 329 U.S. 287, 292 (1946)), the court stated: "We have repeatedly held that Tucker Act review of takings claims is precluded where Congress has provided 'a specific and comprehensive scheme for administrative and judicial review.'" *Id.* at 1372 (quoting *Vereda, Ltda. v. United States,* 271 F.3d 1367, 1375 (Fed. Cir. 2001) (in turn quoting *St. Vincent's Med. Ctr. v. United States,* 32 F.3d 548, 550 (Fed. Cir. 1994))).[10]

---

[10]To the same effect, the D.C. Circuit recently ruled in *Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778 (D.C. Cir. 2006), that a producer-handler who wishes to challenge a new rule that eliminated an exemption for large producer-handlers and required them to pay into a producer settlement fund, was required first to exhaust administrative remedies by petitioning the

6

**STANDARD FOR DECISION**

"Dismissal of a complaint under RCFC 12(b)(6) is appropriate when the plaintiff can prove no set of facts that would warrant the requested relief, when drawing all well-pleaded factual inferences in favor of the complainant." *Levine v. United States*, 453 F.3d 1348, 1350 (Fed. Cir. 2006) (citing *Leider v. United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002)).[11] In ruling on a motion under RCFC 12(b)(6), the court must decide "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). A motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

**ANALYSIS**

A. *The Federal Government's Power to Regulate Interstate Commerce*

Plaintiffs' takings claims are intertwined with the question of what power the federal government possesses to regulate the raisin industry. Pls.' Sur-Reply Br. Opposing Def.'s Mot. to Dismiss ¶ 5. Plaintiffs claim that they have only three options for disposing of their raisins: (1) preparing the raisins for sale to the public, thereby subjecting themselves to the marketing order as handlers; (2) selling the raisins to handlers, again subjecting themselves to the marketing order; or (3) consuming all of the raisins on their farms. *Id.* For all practical purposes, plaintiffs claim, they cannot sell raisins without the government gaining title to and control over a fixed portion as "reserve tonnage" raisins. *See id.*; Compl. ¶¶ 46-47.

Under the Commerce Clause of the Constitution, Congress may regulate the channels of interstate commerce, the instrumentalities of interstate commerce, and persons or things in interstate commerce, including activities that "substantially affect" interstate commerce. *Perez v. United States,* 402 U.S. 146, 150, 152 (1971). Included in the last category are "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

---

Secretary of Agriculture for relief.

[11]Under the Tucker Act, 28 U.S.C. § 1491(a), this court possesses subject matter jurisdiction of a takings claim against the United States. *See Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 12 (1990). In pertinent part, the Tucker Act provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution." 28 U.S.C. § 1491(a). The RAC is an agent of the United States, and the United States may be sued in this court for any takings without just compensation allegedly committed by the RAC. *See Lion Raisins III,* 416 F.3d at 1368.

Illustrative of Congress's power to regulate intrastate activity – and in particular intrastate agricultural activity – is the Depression-era decision in *Wickard v. Fillburn*, 317 U.S. 111 (1942). In *Fillburn*, at issue were regulations promulgated under amendments to the Agricultural Adjustment Act of 1938, Pub. L. No. 75-430, 52 Stat. 31.  The regulations, which were designed to control the volume of wheat in interstate and foreign commerce and thereby stabilize prices, established a wheat acreage allotment for an Ohio farmer named Roscoe Fillburn of 11.1 acres and a yield of 20.1 bushels per acre. *Fillburn*, 317 U.S. at 114-15.  Mr. Fillburn sowed 23 acres and in due course harvested 239 bushels of wheat from the 11.9 acres that exceeded his designated allotment. *Id.* at 114.  In a suit filed in federal district court, Mr. Fillburn contended that the imposed quotas were unconstitutional under the Commerce Clause because the excess wheat he sowed and harvested was intended solely for consumption on his farm and had at most an indirect effect on interstate commerce. *Id.* at 118-19.  After Mr. Fillburn prevailed in a three-judge district court proceeding, the Supreme Court reversed.  In sweeping language, the Supreme Court firmly rejected Fillburn's argument:

> But even if [Fillburn's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'

*Id.* at 125.

*Fillburn* had been partially foreshadowed by the Supreme Court's decision in *United States v. Rock Royal Co-Op., Inc.,* 307 U.S. 533, 569 (1939), which specifically upheld the constitutionality of the Agricultural Marketing Act under the Commerce Clause.[12]  The far-reaching scope of *Fillburn* has remained intact to this day, having been recently reaffirmed in 2005 by the Supreme Court in *Raich*.  *See Raich*, 545 U.S. at 17-18; *id.* at 37 & n.2 (Scalia, J., concurring in the judgment) ("The regulation of an intrastate activity may be essential to a comprehensive regulation of interstate commerce even though the intrastate activity does not itself 'substantially affect' interstate commerce.").

---

[12]In *Rock-Royal*, the operation of the Agricultural Marketing Act was upheld in the context of a milk marketing order, in the face of Fifth Amendment due process and takings contentions advanced as defenses to an enforcement action. *See Rock-Royal*, 307 U.S. 533.  One of the primary defenses in *Rock-Royal* was that an equalization pool established by the milk marketing order at issue, intended to provide a relatively uniform or weighted-average price for milk of similar quality, deprived milk producers of their liberty and property. *Id*. at 571-72.  That broad contention was rejected on the basis of Congress's power under the Commerce Clause: "As the Congress would have, clearly, the right to permit only limited amounts of milk to move in interstate commerce, we are of the opinion it might permit the movement on terms of pool settlement here provided." *Id*. at 572.

Congress's power to regulate the raisin industry in the manner prescribed by the Agricultural Marketing Act is governed by *Fillburn*. Nonetheless, Congress's power to act under the Commerce Clause does not immunize the federal government from a takings claim under the Fifth Amendment. The Commerce Clause, just as the War Power, may well provide the underpinnings for a taking, but the Supreme Court has explicitly stated that there is no "blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority." *Kaiser Aetna v. United States*, 444 U.S. 164, 172 (1979); *see also United States v. Pewee Coal Co.*, 341 U.S. 114, 115-116 (1951) (taking occurred when the government took control of a coal mine during wartime, to assure continued production in the face of a threatened strike). In this same vein, the Federal Circuit has concluded that "the Government's proper exercise of regulatory authority does not automatically preclude a finding that such action is a compensable taking." *Yancey v. United States*, 915 F.2d 1534, 1540 (Fed. Cir. 1990). In short, the Commerce Clause may provide the authority for a taking, but it does not negate the Fifth Amendment's command that the government, having taken a person's property, must pay just compensation. *See id*; *Kaiser Aetna*, 444 U.S. at 174.

### B. *The Scope of the Raisin Marketing Order and Other Such Orders*

The scope of the raisin marketing order is remarkable, but in many ways is typical of other marketing orders. Marketing orders for other agricultural products also employ a variation of the reserve pool mechanism used in the raisin marketing order. *See, e.g.,* 7 C.F.R §§ 930.55-.57 (tart cherries), 981.50-.58 (almonds), 984.54-.56 (walnuts), 985.57 (spearmint oil), 993.56-.65 (prunes). Some marketing orders simply require the handler to hold the reserve portion in his or her possession, *see, e.g.,* 7 C.F.R. § 984.54(b) (requiring a walnut handler to hold reserve walnuts "in his possession or under his control"), while one requires an industry committee, under certain circumstances, to hold the reserves on behalf of individual producers. 7 C.F.R. § 985.57(a) ("The Committee shall store reserve [spearmint] oil for the account of the producer."). Most marketing orders give the industry committee that is acting as the government's agent a plenary power to sell or dispose of the reserves, *see* 7 C.F.R. §§ 981.66(a) (almonds), 984.56(a) (walnuts), 989.67(a) (raisins), 993.65(a) (prunes), but such orders also give either handlers or producers a proportional interest in the net proceeds from any reserve sales. 7 C.F.R. §§ 981.66(e) (almonds), 984.56(e) (walnuts), 989.66(h) (raisins), 993.65(e) (prunes).

In addition to the raisin marketing order, two other marketing orders as a practical matter effect a shift in beneficial ownership somewhat akin to the direct transfer of title of which plaintiffs in this case complain. An almond handler must "at all times, hold in his possession or under his control, in proper storage *for the account of the Board*, the quantity of almonds necessary to meet his reserve obligation." 7 C.F.R. § 981.52 (emphasis added). Nonetheless, handlers do have the option of selling their reserve almonds in non-competitive markets, subject to conditions set by the Board. 7 C.F.R. § 981.67; *see also Cal-Almond, Inc. v. United States,* 30 Fed. Cl. 244, 245 (1994), *aff'd*, 73 F.3d 381 (Fed. Cir. 1995) (Table, text in Westlaw). Moreover, almond growers may sell their almonds at a roadside stand free of the marketing

order's regulation of handlers. *See* 7 C.F.R. § 981.13 (excluding from the definition of handlers any producer who makes such roadside sales).

Under the marketing order for prunes, handlers are required "at all times, [to] hold, in [their] possession or under [their] control, in proper storage *for the account of the committee*, free and clear of all liens, the quantity of prunes necessary to meet [their] reserve obligation." 7 C.F.R. § 993.57 (emphasis added). Nonetheless, prune handlers are not required to effect a physical separation of reserve prunes from "salable" prunes. 7 C.F.R. §§ 993.57, 993.54; *see Prune Bargaining Assoc. v. Butz,* 444 F.Supp. 785, 788-89 (N.D. Cal. 1975) ("These reserve prunes are not physically segregated from the salable prunes, however, and thus the reserve is, in fact, a paper reserve.").[13]

The raisin marketing order, although similar to the almond and prune marketing orders, appears to be stricter. Not only does title to a producer's "reserve tonnage" raisins pass immediately to the government upon sale to a handler, but the handler must physically segregate those raisins for the RAC's account. 7 C.F.R. §§ 989.54, 989.65, 989.66(b)(2).

C. *Plaintiffs' Takings Claim*

1. *Fifth Amendment takings principles.*

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." The Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). In this context, "[t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Maritrans v. United States,* 342 F.3d 1344, 1352 (Fed. Cir. 2003) (*citing Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972)). Rather, "existing rules or understandings" and "background principles" derived from

---

[13]Based solely on the regulatory language, the marketing orders for almonds, walnuts, and prunes explicitly include within the definition of a handler intrastate attempts by producers to market their crops. *See* 7 C.F.R. §§ 981.11, 981.13, 981.16 (handler includes any person who "put[s] almonds . . . into any channel of trade for human consumption . . . within [California]"); 7 C.F.R. §§ 984.4, 984.13, 984.14 (handler includes any person who "put[s] walnuts . . . in the current of commerce within [California]"); 7 C.F.R. §§ 993.4, 993.13, 993.14 (handler includes any person who "place[s] prunes in the current of the commerce within [California]"). The definition of a raisin handler, at least on its face, covers interstate efforts by producers to market their crops. 7 C.F.R. §§ 989.4, 989.15 (handler includes "any person who places . . . raisins in the current of commerce from within [California] *to any point outside thereof*") (emphasis added). Plaintiffs' complaint avers that the raisin marketing order, in practice, regulates even purely intrastate activity. *See* Compl. ¶¶ 46-47; Pls.' Sur-Reply Br. Opposing Def.'s Mot. to Dismiss ¶ 5.

10

independent sources, such as state statutes or common law, define the scope of property rights for Takings Clause purposes.  *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1030 (1992).  Based on these principles, in a takings case, a court must first establish whether a plaintiff holds a property interest for purposes of the Fifth Amendment and then, if such a property interest exists, determine whether a taking occurred.  *See Members of Peanut Quota Holders Ass'n v. United States,* 421 F.3d 1323, 1330 (Fed. Cir. 2005).

      Physical takings are compensable, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982), while regulatory takings may or may not be compensable depending upon the circumstances.  *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.").  For an alleged regulatory taking, the court must make an "essentially ad hoc, factual inquir[y]" guided by three factors – (1) the character of the governmental action, (2) the economic impact of the action, and (3) the degree of interference with the reasonable, investment-backed expectations of the property owner.  *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124-28 (1978); *see also Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 325-328 (2002); *Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring).

      2. *Plaintiffs' property interest in their raisins.*

      Plaintiffs contend that this is a physical, not a regulatory, takings case, primarily because the raisin producers must give up title to the reserve raisins to the RAC in connection with the producers' sale of free-tonnage raisins to handlers.  *See* Pls. Opp. to Def.'s Mot. to Dismiss ("Pls.' Opp.") at 5-8.  The government resists any finding of a taking of a property interest, contending that plaintiffs' participation in the raisin production business is purely voluntary, as is their marketing of raisins.  Def.'s Reply at 2.  As the government would have it, "the reserve pool mechanism [established by the raisin marketing order] is the price of entering that market."  *Id*.

      Plaintiffs claim that the raisin marketing order leaves raisin growers in an untenable position – they must subject themselves to an involuntary transfer of a portion of the raisins they grow, let their raisins rot in their fields, or eat all of their raisins.  Compl. ¶¶ 46-47; Pls.' Sur-Reply Br. Opposing Def.'s Mot. to Dismiss ¶ 5.  Plaintiffs also complain that their equity interest in the net proceeds from the "reserve tonnage" raisins has become worthless for practical purposes.  Compl. ¶ 45.

      The government stresses that plaintiffs do not and cannot allege that the government has entered their property and seized the raisins, that plaintiffs are forced to introduce their raisins into interstate commerce, or that the marketing order forces plaintiffs to sell their raisins to handlers.  Def.'s Mot. to Dismiss at 8.  Citing *Wallace v. Hudson-Duncan Co.*, 98 F.2d 985 (9th Cir. 1938), the government also asserts that Congress has the power under the Commerce Clause to "destroy" an entire industry without running afoul of the Fifth Amendment's Takings Clause,

11

regardless of whether the regulated product is raisins or contraband. *See* Hr'g Tr. 8:22 to 9:2; 13:15-21; 15:1-9 (Nov. 21, 2006).[14]

Here, under California law, plaintiffs unquestionably had title to their raisins grown in their fields. *See* Cal. Rev. & Tax Code § 6016 ("'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses.").[15] Upon sale and transfer of the raisins to a handler, the producers acquired in exchange personal property consisting of cash (for the "free tonnage" raisins) and an equitable interest in the net proceeds of the "reserve tonnage" raisins. Plaintiff producers thus had a property interest in the raisins, and they retained a property interest in the proceeds from the raisins. The real question is whether their transactions with handlers resulted in a "physical" taking.

Plaintiffs argue that the transfer of reserve-tonnage raisins in connection with the sale of free-tonnage raisins to the handlers was involuntary – that once plaintiffs decided to grow raisins, there was no escape from the raisin marketing order, plaintiffs had no ability to opt out, and the result was a *per se* taking. *See* Pls.' Sur-Reply Br. Opposing Def.'s Mot. to Dismiss ¶ 5. This contention is unavailing. Although the RAC gains title to some of the raisins that plaintiffs grow, the transfer does not have the same consequences as, for example, entry by governmental

---

[14]In this respect, the government overstates the holding in *Wallace*. In *Wallace*, the majority opinion for a panel that divided 2 to 1, stated that "even if the [walnut packer] were able to show (which it has not done) that the only alternative to making delivery to the Control Board of surplus [i.e., reserve] walnuts . . . would be to go out of business," case law would support upholding the walnut marketing order. *Wallace*, 98 F.2d at 990. Putting aside that the hypothetical is dictum, the cases the court cited in support of this proposition, *see id.* (citing *Montana Timber Co. v. Washington*, 243 U.S. 219 (1917); *Noble State Bank v. Haskell*, 219 U.S. 104 (1911)), did not confirm that destruction of an entire industry was permissible under the Commerce Clause without implicating the Fifth Amendment's Due Process or Takings Clauses. Rather, the cited cases upheld regulatory schemes, imposed respectively by the states of Washington and Oklahoma, in which individual participants were required to contribute to a pool even though any distributions from the pool might not fully compensate them for their original contributions. *See id.* Although the court indicated that the plaintiff in *Wallace* had the option of avoiding the walnut regulations altogether by "retirement from the business," the facts of the case did not present the question whether the federal government had power to destroy an entire industry without implicating the Takings or Due Process Clauses. *See* 98 F.2d at 990-91. In any event, action taken in reliance upon the Commerce Clause manifestly is not immune from takings challenges. *Kaiser*, 444 U.S. at 172; *Yancey*, 915 F.2d at 1540.

[15]This definition of "tangible personal property" applies for tax purposes, not for California law generally, *see Filmservice Labs., Inc. v. Harvey Bernhard Enters., Inc.,* 208 Cal. App. 3d 1297, 1305 (1989), but the definition nonetheless accords with common-law usage relating to goods, products, and agricultural commodities. *See* Cal. Com. Code § 2105(1) (definition of "goods").

officials upon their land for purposes of confiscating their raisins would have. There is no physical invasion of property, *see Loretto*, 458 U.S. at 421 (cable television company's installation of its cable facilities on plaintiff's property); *Pewee Coal,* 341 U.S. at 115-16 (federal occupation of plaintiff's coal mine), nor is there any "direct appropriation of property." *Carruth v. United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980) (addressing peanut marketing regulations). Instead, the government is the recipient of a portion of the raisins that plaintiffs shipped to handlers subject to the marketing order. *See Carruth*, 627 at 1081; *Wallace*, 98 F.2d at 989-90 (upholding walnut marketing regulations). In essence, plaintiffs are paying an admissions fee or a toll – admittedly a steep one – for marketing raisins. The government does not force plaintiffs to grow raisins or to market the raisins; rather, it directs that *if* they grow and market raisins, then passing title to their "reserve tonnage" raisins to the RAC is their admission ticket. *See Wallace,* 98 F.2d at 989 ("The [marketing] [o]rder contains no absolute requirement of the delivery of walnuts to the Control Board. The requirement is a conditional one.")[16]

     In the circumstances at hand, if plaintiffs have a takings claim, it would relate to their property interest, equitable in nature, in the net proceeds from the disposition of the "reserve tonnage" raisins. 7 U.S.C. § 608c(6)(E); 7 C.F.R. § 989.66(h). In this case, however, plaintiffs have put forward no explicit claim as to this property interest, and the court will not consider that such a claim has been made by implication from plaintiffs' contention that their equitable interest has in recent years proven to be worthless or nearly so. Among other things, such a claim would have to be limned with particularity, and there appear to be at least four conceptually possible avenues for plaintiffs to pursue vindication of their property rights in the equity pool.[17]

---

[16]However harsh the consequences of the raisin marketing order, the consequences attendant to marketing raisins were known in advance. Although the transfer of title to the reserve raisins to the RAC cannot be considered as "voluntary" in the sense that it was a desired outcome of intended action, neither was it an unexpected result of such action. *See Carruth*, 627 F.2d at 1081 (peanut regulations); *Wallace*, 98 F.2d at 989-90 (walnut regulations); *cf. Lucas,* 505 U.S. at 1027-1028 ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)."); *Norman v. United States,* 429 F.3d 1081, 1089 (Fed. Cir. 2005) (rejecting plaintiffs' takings challenge where plaintiffs "did transfer title in the wetland acreage . . . , [but] the record is clear that the title transfer was voluntary").

[17]Because the "free" and "reserve" percentages vary from crop year to crop year, *see* Compl. ¶ 34, and in some years there may be no reserve at all, plaintiffs would have difficulty posing generic, facial claims about their equitable interest in the reserve pool. *See, e.g., id.* ¶ 34.6 (no reserve for crop year 2004-05).

First, plaintiffs could make a regulatory takings claim, arguing that the RAC, by returning only meager pool proceeds to plaintiffs, effected a taking. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1330-31 (Fed. Cir. 2003). Instead, plaintiffs here claimed a taking of their property interest in raisins they had already exchanged for cash and equity interests in the reserve pool. Compl. ¶¶ 46-47, 51.

Second, plaintiffs might petition the Secretary of Agriculture for an administrative remedy. As producers, plaintiffs are specifically excluded from the Agricultural Marketing Act's scope, 7 U.S.C. § 608c(13)(B), and administrative remedies are limited to handlers. 7 U.S.C. § 608c(15). Plaintiffs claim, Hr'g Tr. 64: 7-14 (Nov. 21, 2006), and the government concedes, Def.'s Resp. to Pls.' Post-argument Submissions of Additional Authorities at the Court's Request at 1, that producers have no remedy under the Agricultural Marketing Act. In administrative proceedings, the Secretary has adhered to this interpretation of the statute. *See, e.g., In re Kent Cheese Co.*, 43 Agric. Dec. 34, 36 (1984) (denying standing to petitioner who did not allege he was a handler under the regulatory definition); *In re M&R Tomato Distribs., Inc.*, 41 Agric. Dec. 33, 33 (1982) (same). Nonetheless, if plaintiffs themselves packaged their raisins or introduced them into interstate commerce, they would be deemed handlers, *see* 7 C.F.R. §§ 989.14, 989.15, and would then have an administrative remedy. 7 U.S.C. § 608c(15).

Third, plaintiffs could file suit in federal district court, alleging that the Secretary or the RAC has violated the Agricultural Marketing Act, the raisin marketing order, or the associated regulations. As producers, plaintiffs might qualify for the narrow exception to the general rule that *handlers* must exhaust their administrative remedies under the Agricultural Marketing Act. *See Stark v. Wickard*, 321 U.S. 288, 309 (1944). As the Supreme Court explained:

> When . . . *definite personal rights are created by federal statute*, . . . the silence of Congress as to judicial review is, at any rate *in the absence of an administrative remedy*, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction.

*Stark*, 321 U.S. at 309 (emphasis added). Given the specific "personal right" to a proportional share of the reserve pool net proceeds, 7 C.F.R. § 989.66(h), and the circumstance that an administrative remedy is limited to handlers, 7 U.S.C. § 608c(15), plaintiffs might sue in federal district court without first seeking an administrative remedy. *See Stark,* 321 U.S. at 311; *Edaleen Dairy*, 467 F.3d at 782-83. Unlike the plaintiffs in *Lion Raisins III,* 416 F.3d at 1369-70, however, plaintiffs in this case do not contend that the government has violated the Agricultural Marketing Act or the raisin marketing order, *see* Compl. ¶¶ 4, 48-51, but rather, they claim that the government's application of the statute and the marketing order has taken their "reserve tonnage" raisins without just compensation. *Id.* ¶¶ 46-47, 51.

Fourth, plaintiffs might claim they were subject to an illegal exaction. The species of claim known as an illegal exaction has several variations. A plaintiff may sue for a sum

14

"improperly exacted or retained" in violation of the Constitution, a statute, or a regulation. *United States v. Testan,* 424 U.S. 392, 401 (1976); *see also Eastport S. S. Corp. v. United States,* 372 F.2d 1002, 1007 (Ct. Cl. 1967) (*overruled on other grounds* by *Malone v. United States,* 849 F.2d 1441, 1444-45 (Fed. Cir. 1988)).  Alternatively, a plaintiff may pursue an allegation that a "particular provision of law relied upon grants [him], expressly or by implication, a right to be paid a certain sum" and that he has not been so paid. *Eastport S. S. Corp,* 372 F.2d at 1007; *see also Aerolineos Argentinas v. United States*, 77 F.3d 1565, 1573 (Fed. Cir. 1996) (an airline could seek reimbursement of costs borne by it for transporting aliens who had sought political asylum in the United States, because the costs were paid "at the direction of the government to meet a governmental obligation").  An illegal exaction constitutes a compensable violation of the Fifth Amendment's Due Process Clause. *See Norman*, 429 F.3d at 1096.[18] To prevail, plaintiffs would need to demonstrate that the Secretary or the RAC had violated the Agricultural Marketing Act, the raisin marketing order, or the associated regulations and that the government's conduct had a "direct and substantial impact on [them]." *Casa de Cambio Comdiv S.A., de C.V. v. United States,* 291 F.3d 1356, 1364 (Fed. Cir. 2002); *accord Norman*, 429 F.3d at 1096; *Ontario Power Generation, Inc. v. United States,* 369 F.3d 1298, 1303 (Fed. Cir. 2004).  Plaintiffs have made no such illegal exaction claims as to their equitable interest in the reserve pool.

Any of these reserve-pool claims would reach well beyond the scope of the challenged complaint.  In short, the producer plaintiffs have made no claims as to the one affected property interest that results from their growing and marketing activities – their equity interest in the reserve pool.  Accordingly, they have not stated a claim upon which relief can be granted under RCFC 12(b)(6).

## CONCLUSION

For the reasons set forth, the government's motion to dismiss under RCFC 12(b)(6) is GRANTED.  The Clerk shall enter judgment accordingly.  No costs.

It is so ORDERED.

s/ Charles F. Lettow<br>
Charles F. Lettow<br>
Judge

---

[18]Although "[t]he Court of Federal Claims ordinarily lacks jurisdiction over due process claims under the Tucker Act, 28 U.S.C. § 1491, . . . [it] has been held to have jurisdiction over illegal exaction claims 'when the exaction is based upon an asserted statutory power.'" *Norman*, 429 F.3d at 1095 (quoting *Aerolineas Argentinas*, 77 F.3d at 1573, and citing *Eastport S.S. Corp.*, 372 F.2d at 1008).